**FONOVISA, INC., Plaintiff,**

v.

**CHERRY AUCTION, INC., Richard Pilegard, W.D. Mitchell, and Margaret Mitchell, Defendants.**

**No. CV–F–93–5116–REC.**

United States District Court,
E.D. California.

March 21, 1994.

**1494**

Jeffrey M. Thompson and Craig E. Lindberg, Callahan and Gauntlett, Irvine, CA, for plaintiff.

Stephen Roy Cornwell, McCormick Barstow Sheppard Wayte and Carruth, Fresno, CA, for defendants.

## ORDER RE DEFENDANTS' MOTION FOR DISMISSAL

COYLE, Chief Judge.

On October 25, 1993, this Court heard defendants' motion for dismissal of the complaint pursuant to Fed.R.Civ. 12(b)(6). Upon consideration of the written and oral arguments of the parties and the record set forth herein, the motion is granted for the following reasons.

## I. BACKGROUND

Defendants operate the Cherry Auction swap meet where independent vendors set up booths that sell Latin music tapes, among other things. Plaintiff Fonovisa alleges that many of these tapes are counterfeits of phonorecordings to which it has copyright and trademark rights. Plaintiff therefore sues, not the vendors themselves, but Cherry Auction and its three owners/operators, Pilegard and the Mitchells, for direct and indirect copyright and trademark infringement. The complaint names five counts, entitled (1) "copyright infringement;" (2) "contributory copyright infringement;" (3) "vicarious copyright infringement;" (4) "contributory and vicarious trademark infringement;" and (5) "vicarious liability of the owners, operators, directors, and officers of Cherry Auction."

The complaint recounts the history of events to show defendants' awareness of the vendors' infringing sales, and their failure to do anything about it. On December 12, 1991, the Fresno County Sheriff's Department raided Cherry Auction and seized 38,014 counterfeit tapes, confiscated 12 vehicles, and made 27 arrests. Not only were defendants notified of the raid and its results, but the raid was publicized in the Fresno Bee ten days later.

On October 19, 1992, Sergeant Michael Mosier of the Fresno County Sheriff's Department wrote to general manager Pilegard to memorialize his visit to the swap meet six days earlier. His letter observed that several casual vendors of Latin audio music tapes had abandoned their booths upon his arrival, and that Pilegard had admitted that these vendors did not ordinarily carry a required State Board of Equalization form, nor did they usually reserve spaces that require more identification. Sgt. Mosier finally reminded Pilegard of his promise to get the name, address, vehicle license number, and State Board of Equalization identification of prospective renters. Defendants have done nothing to comply with these "simple remedial" steps.

On January 9, 1993, Fonovisa's investigator revisited Cherry Auction and observed the same infringing sales. Counterfeit Fonovisa cassette tapes sold for $2.00 or three for

$5.00—an impossibly low price for legitimate music products.

On April 9, 1993, Fonovisa served defendants with the First Amended Complaint in this action. The next day, Fonovisa's investigator again saw ten of fifteen vendors selling counterfeits at tellingly low prices. He saw twelve of seventeen booths doing the same a few days later.

On June 21, 1993, over a year and a half after the initial raid, and two months after this lawsuit was filed, defendant Pilegard wrote a letter to the Fresno County Sheriff's Department to report the possible sale of illegal tapes at the swap meet, assuring them that "we want to do whatever we can on our part ... to put a stop to this activity." The Sheriff's Department responded to this letter by suggesting that defendants should stop renting spaces to counterfeit tape vendors and offered examination techniques to detect illegal cassette tapes. Defendants never implemented these "simple procedures," for Fonovisa's investigators witnessed between nine and twelve vendors selling counterfeits on three more occasions.

Plaintiff alleges generally that defendants have the right and ability to supervise the infringing activities occurring upon its premises and also possess a direct financial interest in their success. However, plaintiff couches neither this supervisory role, nor the financial interest, in factual allegations.

The basic legal issue is whether Fonovisa can state a copyright or trademark claim against a swap meet and its owners for infringing activities of vendors who rent booths from them. All defendants contend that no claim exists, and move for Rule 12(b)(6) dismissal of the entire complaint.

## II. DEFENDANTS' MOTION FOR DISMISSAL

■ Fonovisa's complaint falls to the ground if it fails to state a claim upon which relief can be granted. Fed.R.Civ.Proc. 12(b)(6). Dismissal is proper where there is either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.

1988). "A complaint cannot be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

■ The Court accepts as true all material allegations in the complaint, no matter how improbable, as well as reasonable inferences to be drawn from them. *NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986). However, the Court accepts as true neither conclusory allegations nor unreasonable inferences or unwarranted deductions of fact. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981).

### A. Claim One: Direct Copyright Infringement

■ A claim for copyright violation must allege (1) the specific original work that is the subject of the copyright claim; (2) that the plaintiff owns the copyright on the work; (3) that the work in question has been registered in compliance with the statute; and (4) *by what acts and during what time the defendant has infringed the copyright*. *Klinger v. Weekly World News, Inc.*, 747 F.Supp. 1477 (S.D.Fla.1990) (emphasis added).

■ A factual allegation to support the fourth element of a direct infringement action is notably missing, and cannot be inferred from Fonovisa's chronology. It is the vendors who directly infringed Fonovisa's copyrights and trademarks by selling the counterfeits, not defendants. No where does Fonovisa suggest that Cherry Auction and its operators reproduced, prepared, or distributed its copyrighted works in violation of 17 U.S.C. §§ 106 and 501. At most, defendants "aided and abetted" the vendors in direct infringement by the latter, and thus exposed themselves to potential liability for *indirect* infringement, as discussed below. The first claim thus falls to the ground.

### B. Claim Two: Contributory Copyright Infringement

■ One may be liable for copyright infringement without himself having per-

formed the protected composition. *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159 (2d Cir. 1971). One brand of indirect liability is *contributory* liability, predicated upon the common law doctrine of joint tortfeasorship.[1]

Contributory liability for copyright infringement requires two elements: (1) *knowledge* of the copyright infringing activity, and (2) *substantial participation,* i.e., inducement, cause, or material contribution, to the infringing conduct of another. *Id.* at 1162. For example, a sponsor who arranges audiences may be contributorily liable for an artist's illegal performance of copyrighted compositions. *See Gershwin Publishing Corp.,* 443 F.2d at 1159. This liability arises, not from formal power, but from the sponsor's knowledge of the violations, direction of the programming, and position to police the infringing conduct.

■ The complaint plainly alleges the first element, knowledge. However, unless the complaint also alleges that defendants exercised any control over the vendors, there can be no contributory infringement. *Demetriades v. Kaufmann,* 690 F.Supp. 289 (S.D.N.Y.1988) (Something deriving from one's substantial involvement is needed) (citing *Restatement (Second) of Torts* § 876(b) (1977)). At most, one can infer from the complaint that defendants provided a safe haven and clientele seeking "bargain basement" prices. Contrary to plaintiff's argument, nothing in the complaint suggests that defendants promoted, advertised, and encouraged the sale of counterfeit products, or protected the identity of the infringers. Although they did not affirmatively cooperate with the police, defendants did not prevent enforcement actions from taking place, as plaintiff argues.

Merely renting booth space is not "substantial participation" in the vendors' infringement activities. Defendants were not in the business of directing vendors' actions by telling them, or even suggesting to them, what and when and how and to whom to sell. Cherry Auction's so-called "role" would have been the same if vendors rented the space to just sit on. There is no way to infer from the complaint that Cherry Auction acted *in concert* with the vendors to accomplish the common purpose or plan of selling counterfeits. Any "participation" was passive, at most, and not nearly "substantial" enough to warrant defendants the label of joint tortfeasors.

The second claim for contributory copyright infringement thus falls to the ground.

### C. Claim Three: Vicarious Copyright Infringement

■ The other brand of indirect copyright infringement is *vicarious liability* which springs from the agency rule of respondeat superior, holding an employer liable for infringement by a servant within his scope of employment. *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304 (2d Cir.1963). Vicarious liability depends on two things: (1) a financial *interest* in the infringing entity and (2) the extent of one's right and ability to *supervise* the infringing activity. *Gershwin Publishing Corp.,* 443 F.2d at 1159. For example, the chain store owner in *Shapiro* was liable for a record concessionaire's sale of bootleg records because the owner both retained the ultimate right to supervise the concessionaire's employees, and reserved for himself a share of record sales.

The *Shapiro* court's policy was to impose liability on the party who had the power to carefully police the conduct of the direct infringer. Liability places responsibility where it can and should be effectively exercised. *Shapiro, Bernstein & Co.,* 316 F.2d at 308. The court sought to discourage chain and department stores from establishing dummy concessionaires and shielding their eyes from the possibility of copyright infringement, while reaping the proceeds of infringement. *Id.* at 309.

■ The Cherry Auction neither supervised nor profited from the vendors' sales. For the same reasons that defendants did not substantially participate in the vendors' activities, neither did defendants supervise

---

1. In California, "joint tortfeasors" has been narrowly defined as those who act *in concert* to accomplish some common purpose or plan, and whose concerted acts cause the harm. 5 Witkin, *Summary of California Law: Torts* § 43, at 106.

them. The argument that defendants could have "policed" the vendors by refusing to lease spaces to them has only specious appeal. For one thing, the *Shapiro* court speaks of *a priori* supervisory power; that is, the power to supervise the direct infringers in the general course of business, e.g., what to sell, whom to hire, how much to charge. Defendants could not inferably have assumed this supervisory role over the vendors. Without question, Cherry Auction has sovereignty over the meet's grounds and can refuse a vendor for not just selling counterfeits, but for any number of arbitrary reasons. This may be a *posteriori* supervision. But, this is not supervisory power in the context of vicarious infringement. Cherry Auction's sovereignty over its property does not liken it to being the vendors' employer in the respondeat superior sense. The complaint makes no factual allegations to suggest otherwise.

Moreover, the economic principle of placing liability on the party who can best prevent the wrongdoing is lost on this situation. The Cherry Auction is not in the best position to guard against intellectual property violations. The Cherry Auction is, however, in the business of renting cheap spots to vendors who want to swap cheap items. Like most flea markets, it does little more than avail to others a bare site to carry out their own business transactions. It is not in the business of overseeing that market, ensuring the integrity of the goods sold, or otherwise pleasing customers. It is therefore ill-equipped to do those things, and imposing vicarious liability would force the Auction to take foreign measures, such as hiring an "Intellectual Property Patrol." Inevitably, these steps lead to perverse economic consequences, driving up the price of running a swap meet and renting a space, thereby depriving the public of a well-known cheap marketplace.[2]

Inferring the Auction's direct financial benefit from the vendors' activities is even less likely. The Court rejects the com-

plaint's conclusory allegation that "[d]efendants ... also has [sic] a direct financial interest in the success of such infringing activities." Plaintiff alternatively asks the Court to infer direct financial benefit from its allegation that the majority of Cherry Auction vendors sell counterfeit Latin music tapes. This inference is unreasonable for two reasons. First, there is no suggestion that the Cherry Auction derived a *direct* financial benefit by reserving for itself a share of the receipts for sale of music products, as was done in *Shapiro*. Plaintiff does not refute defendants' contention that the Cherry Auction merely charges a modest admission fee of $10 or less. Second, such an inference requires the Court to believe that absent counterfeit tape sales, Cherry Auction would suffer from diminished rentals. That is, Cherry Auction vendors have nothing else to sell and no other reason to lease booth space. This extreme premise is neither explicit nor implicit from the complaint.

The count for vicarious copyright infringement fails.

### D. Claim Four: Contributory and Vicarious Trademark Infringement

▆ The fourth count is actually two separate actions for indirect trademark infringement: contributory infringement and vicarious infringement. As a general rule, secondary liability for trademark infringement should be more narrowly drawn than secondary liability for copyright infringement. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).

### 1. Contributory Trademark Infringement

▆ In *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), the Supreme Court decided whether generic drug manufacturers were contributorily liable for infringement by pharmacists who dispensed

---

**2.** It is worth noting that entities like Fonovisa are in a far better position to police infringing activities. The complaint reveals that Fonovisa not only hires its own investigators, but can enlist police aid. *See also* Craig O. Correll, *Using Criminal Sanctions to Combat Trademark Counterfeiting*, 14 AIPLA Q.J. 278 (1992) (discussing Cal.Penal Code §§ 350 and 351a which authorize citizen's arrests for criminal violations which occur in the citizen's presence).

the generic drug under the original drug's trademark:

> Even if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances. Thus if a manufacturer or distributor intentionally induces another to infringe a trademark, or if *it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement,* the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit.

*Id.* 456 U.S. at 853–54, 102 S.Ct. at 2188, 72 L.Ed.2d at 615 (emphasis added). The two elements for contributory trademark infringement are thus summed up as (1) supply of a product, and (2) knowledge of direct infringement. The Court accepts as true the complaint's allegation of the latter. The question is whether the complaint alleges that Cherry Auction supplied a "product" to the vendors in the *Inwood* sense.

The Auction's lease of space is not a supply of a "product" or "good" in the plain sense of those words. Can "product" then be *extended* to include booth space? An examination of the impetus behind *Inwood's* "product" requirement suggests that the answer is no. The alleged secondary infringer in *Inwood,* drug manufacturers, actually manufactured the good that was ultimately palmed off as made by someone else. Here, Cherry Auction offers nothing to the vendors that reaches consumers as an object causing likely confusion. What actually reaches the public—the ambience, ethos and nature of the flea market forum—hardly helps confuse buyers into believing that they are getting authentic music products.

Moreover, the doctrine of joint tortfeasorship, upon which contributory liability in both copyright and trademark infringement is based, compels the same conclusion. As discussed earlier, "joint tortfeasors" can be narrowly defined as those who act *in concert* to accomplish some *common purpose or plan,* and whose concerted acts cause the harm. *See* 5 Witkin, *supra,* § 43, at 106. The complaint far from suggests that Cherry Auction and the vendors put their heads together to plan a counterfeiting scheme. The Cherry Auction merely minded its own business—renting booth spaces—giving rise to no contributory trademark infringement.

The Seventh Circuit disagreed and extended the meaning of "good" to include rental of swap meet space. *See Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.,* 955 F.2d 1143 (7th Cir.1992) (Owner of flea market could be contributorily liable for trademark infringement by vendor of counterfeit Hard Rock Cafe t-shirts). However, that court relied heavily on the Restatement Second's sweeping proposition that a third person is liable for another's tortious conduct if he "permits the other to act upon his premises or with his instrumentalities, knowing or having reason to know that the other is acting or will act tortiously." *Restatement (Second) Torts,* § 876, at 320 (1979). Nothing suggests that the Ninth Circuit has adopted the Restatement position to construe the common law of tort in trademark or other cases.

Moreover, the court's reasoning hinged on a tenuous distinction. On the one hand, it held that swap meet owners who knew of, or were "willfully blind" to, counterfeit sales were contributorily liable. On the other hand, if they didn't know, they had no duty to "seek out and prevent violations" and act as "more dutiful guardians of Hard Rock's commercial interests." In a practical sense, a swap meet's duty to hire patrol and investigators to crack down on counterfeiters sprang from its mere knowledge that such things were going on. Rather than identify a duty which originates independently from trademark law, the court essentially reasoned that since the swap meet knew what was going on and might have done something to stop it, it should have. This Court refuses to follow this results-oriented course to impose liability on third parties who have never had a traditional role in enforcing the Lanham Act.

### 2. *Vicarious Trademark Infringement*

With the admonition in mind that secondary liability in trademark infringement is more narrowly drawn than that in copyright infringement, *Sony Corp. of America,*

464 U.S. at 439 n. 19, 104 S.Ct. at 787 n. 19, this Court declines to extend vicarious trademark infringement to reach the Cherry Auction defendants. Vicarious liability for trademark infringement requires that a defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties, or exercise joint ownership or control over the infringing product. *See David Berg & Co. v. Gatto Int'l Trading Co.*, 884 F.2d 306, 311 (7th Cir.1989). None of plaintiff's allegations remotely suggest that the Cherry Auction and the vendors shared such relationships.

E. *Claim Five: Vicarious Liability of the Owners, Operators, Directors, and Officers of Cherry Auction*

Because no action lies against Cherry Auction, Inc., none lies against the three individual defendants, Pilegard and the Mitchells.

ACCORDINGLY, IT IS ORDERED that defendants' motion for dismissal is granted as set forth herein.