FONOVISA, INC., Plaintiff–Appellant,

v.

CHERRY AUCTION, INC.; Richard Pilegard, W.D. Mitchell, Margaret Mitchell, Defendants–Appellees.

No. 94–15717.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 13, 1995.

Decided Jan. 25, 1996.

Craig E. Lindberg, J. Craig Williams, Callahan, Blaine & Williams, Irvine, California, for Plaintiff–Appellant.

Stephen R. Cornwell and Bruce William Kelley, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, California, for Defendants–Appellees.

Anthony M. Keats, Larry W. McFarland, Rebecca I. Lobl, Baker & Hostetler, Los Angeles, California, for the International Anticounterfeiting Coalition, Inc. as amicus curiae in support of plaintiff-appellant.

Russell J. Frackman, argued, and Robert C. Welsh, Mitchell, Silberberg & Knupp, Los Angeles, California; Jose Zorrilla Jr., Zorrilla Law Corporation, Irvine, California; David A. Gauntlett and Leo E. Lundberg, Jr., Gauntlett & Associates, Irvine, California; Craig E. Lindberg, formerly of Callahan & Gauntlett, Irvine, California, for Plaintiff–Appellant Fonovisa, Inc.

Robert C. Welsh and Russell J. Frackman, Mitchell, Silberberg & Knupp, Los Angeles, California, for the Recording Industry Association of America, Inc., as amicus curiae in support of Plaintiff–Appellant.

Before: SCHROEDER and ALARCON, Circuit Judges, and PANNER,[*] District Court Judge.

SCHROEDER, Circuit Judge:

This is a copyright and trademark enforcement action against the operators of a swap meet, sometimes called a flea market, where third-party vendors routinely sell counterfeit recordings that infringe on the plaintiff's copyrights and trademarks. The district court dismissed on the pleadings, holding that the plaintiffs, as a matter of law, could not maintain any cause of action against the swap meet for sales by vendors who leased

[*] Honorable Owen M. Panner, Senior United States District Judge for the District of Oregon, sitting by designation.

its premises. The district court's decision is published. *Fonovisa Inc. v. Cherry Auction, Inc.*, 847 F.Supp. 1492 (E.D.Cal.1994). We reverse.

### Background

The plaintiff and appellant is Fonovisa, Inc., a California corporation that owns copyrights and trademarks to Latin/Hispanic music recordings. Fonovisa filed this action in district court against defendant-appellee, Cherry Auction, Inc., and its individual operators (collectively "Cherry Auction"). For purposes of this appeal, it is undisputed that Cherry Auction operates a swap meet in Fresno, California, similar to many other swap meets in this country where customers come to purchase various merchandise from individual vendors. *See generally, Flea Market Owner Sued for Trademark Infringement*, 4 No. 3 J. Proprietary Rts. 22 (1992). The vendors pay a daily rental fee to the swap meet operators in exchange for booth space. Cherry Auction supplies parking, conducts advertising and retains the right to exclude any vendor for any reason, at any time, and thus can exclude vendors for patent and trademark infringement. In addition, Cherry Auction receives an entrance fee from each customer who attends the swap meet.

There is also no dispute for purposes of this appeal that Cherry Auction and its operators were aware that vendors in their swap meet were selling counterfeit recordings in violation of Fonovisa's trademarks and copyrights. Indeed, it is alleged that in 1991, the Fresno County Sheriff's Department raided the Cherry Auction swap meet and seized more than 38,000 counterfeit recordings. The following year, after finding that vendors at the Cherry Auction swap meet were still selling counterfeit recordings, the Sheriff sent a letter notifying Cherry Auction of the on-going sales of infringing materials, and reminding Cherry Auction that they had agreed to provide the Sheriff with identifying information from each vendor. In addition, in 1993, Fonovisa itself sent an investigator to the Cherry Auction site and observed sales of counterfeit recordings.

Fonovisa filed its original complaint in the district court on February 25, 1993, and on March 22, 1994, the district court granted defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). In this appeal, Fonovisa does not challenge the district court's dismissal of its claim for direct copyright infringement, but does appeal the dismissal of its claims for contributory copyright infringement, vicarious copyright infringement and contributory trademark infringement.

The copyright claims are brought pursuant to 17 U.S.C. §§ 101 *et seq.* Although the Copyright Act does not expressly impose liability on anyone other than direct infringers, courts have long recognized that in certain circumstances, vicarious or contributory liability will be imposed. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 435, 104 S.Ct. 774, 785, 78 L.Ed.2d 574 (1984) (explaining that "vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying circumstances in which it is just to hold one individually accountable for the actions of another").

Similar principles have also been applied in the trademark field. *See Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 844–46, 102 S.Ct. 2182, 2184, 72 L.Ed.2d 606 (1982). The Seventh Circuit, for example, has upheld the imposition of liability for contributory trademark infringement against the owners of a flea market similar to the swap meet operated by Cherry Auction. *Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143 (7th Cir. 1992). The district court in this case, however, expressly rejected the Seventh Circuit's reasoning on the contributory trademark infringement claim. Contributory and vicarious copyright infringement, however, were not addressed in *Hard Rock Cafe*, making this the first case to reach a federal appeals court raising issues of contributory and vicarious copyright infringement in the context of swap meet or flea market operations.

We analyze each of the plaintiff's claims in turn.

### Vicarious Copyright Infringement

The concept of vicarious copyright liability was developed in the Second Circuit as an

outgrowth of the agency principles of respondeat superior. The landmark case on vicarious liability for sales of counterfeit recordings is *Shapiro, Bernstein and Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir.1963). In *Shapiro*, the court was faced with a copyright infringement suit against the owner of a chain of department stores where a concessionaire was selling counterfeit recordings. Noting that the normal agency rule of respondeat superior imposes liability on an employer for copyright infringements by an employee, the court endeavored to fashion a principle for enforcing copyrights against a defendant whose economic interests were intertwined with the direct infringer's, but who did not actually employ the direct infringer.

The *Shapiro* court looked at the two lines of cases it perceived as most clearly relevant. In one line of cases, the landlord-tenant cases, the courts had held that a landlord who lacked knowledge of the infringing acts of its tenant and who exercised no control over the leased premises was not liable for infringing sales by its tenant. *See e.g. Deutsch v. Arnold*, 98 F.2d 686 (2d Cir.1938); *c.f. Fromont v. Aeolian Co.*, 254 F. 592 (S.D.N.Y.1918). In the other line of cases, the so-called "dance hall cases," the operator of an entertainment venue was held liable for infringing performances when the operator (1) could control the premises and (2) obtained a direct financial benefit from the audience, who paid to enjoy the infringing performance. *See e.g. Buck v. Jewell–La-Salle Realty Co.*, 283 U.S. 191, 198–199, 51 S.Ct. 410, 411–12, 75 L.Ed. 971 (1931); *Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.*, 36 F.2d 354 (7th Cir.1929).

From those two lines of cases, the *Shapiro* court determined that the relationship between the store owner and the concessionaire in the case before it was closer to the dance-hall model than to the landlord-tenant model. It imposed liability even though the defendant was unaware of the infringement. *Shapiro* deemed the imposition of vicarious liability neither unduly harsh nor unfair because the store proprietor had the power to cease the conduct of the concessionaire, and because the proprietor derived an obvious and direct financial benefit from the infringement. 316 F.2d at 307. The test was more clearly articulated in a later Second Circuit

case as follows: "even in the absence of an employer-employee relationship one may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971). *See also* 3 Melville Nimmer & David Nimmer, Nimmer on Copyright § 1204(A)[1], at 1270–72 (1995). The most recent and comprehensive discussion of the evolution of the doctrine of vicarious liability for copyright infringement is contained in Judge Keeton's opinion in *Polygram Intern. Pub., Inc. v. Nevada/TIG, Inc.*, 855 F.Supp. 1314 (D.Mass.1984).

The district court in this case agreed with defendant Cherry Auction that Fonovisa did not, as a matter of law, meet either the control or the financial benefit prong of the vicarious copyright infringement test articulated in *Gershwin, supra*. Rather, the district court concluded that based on the pleadings, "Cherry Auction neither supervised nor profited from the vendors' sales." 847 F.Supp. at 1496. In the district court's view, with respect to both control and financial benefit, Cherry Auction was in the same position as an absentee landlord who has surrendered its exclusive right of occupancy in its leased property to its tenants.

This analogy to absentee landlord is not in accord with the facts as alleged in the district court and which we, for purposes of appeal, must accept. The allegations below were that vendors occupied small booths within premises that Cherry Auction controlled and patrolled. According to the complaint, Cherry Auction had the right to terminate vendors for any reason whatsoever and through that right had the ability to control the activities of vendors on the premises. In addition, Cherry Auction promoted the swap meet and controlled the access of customers to the swap meet area. In terms of control, the allegations before us are strikingly similar to those in *Shapiro* and *Gershwin*.

In *Shapiro*, for example, the court focused on the formal licensing agreement between defendant department store and the direct infringer-concessionaire. There, the concessionaire selling the bootleg recordings had a

licensing agreement with the department store (H.L. Green Company) that required the concessionaire and its employees to "abide by, observe and obey all regulations promulgated from time to time by the H.L. Green Company," and H.L. Green Company had the "unreviewable discretion" to discharge the concessionaires' employees. 316 F.2d at 306. In practice, H.L. Green Company was not actively involved in the sale of records and the concessionaire controlled and supervised the individual employees. *Id.* Nevertheless, H.L. Green's ability to police its concessionaire—which parallels Cherry Auction's ability to police its vendors under Cherry Auction's similarly broad contract with its vendors—was sufficient to satisfy the control requirement. *Id.* at 308.

In *Gershwin,* the defendant lacked the formal, contractual ability to control the direct infringer. Nevertheless, because of defendant's "pervasive participation in the formation and direction" of the direct infringers, including promoting them (i.e. creating an audience for them), the court found that defendants were in a position to police the direct infringers and held that the control element was satisfied. 443 F.2d at 1163. As the promoter and organizer of the swap meet, Cherry Auction wields the same level of control over the direct infringers as did the *Gershwin* defendant. *See also Polygram,* 855 F.Supp. at 1329 (finding that the control requirement was satisfied because the defendant (1) could control the direct infringers through its rules and regulations; (2) policed its booths to make sure the regulations were followed; and (3) promoted the show in which direct infringers participated).

The district court's dismissal of the vicarious liability claim in this case was therefore not justified on the ground that the complaint failed to allege sufficient control.

■ We next consider the issue of financial benefit. The plaintiff's allegations encompass many substantive benefits to Cherry Auction from the infringing sales. These include the payment of a daily rental fee by each of the infringing vendors; a direct payment to Cherry Auction by each customer in the form of an admission fee, and incidental payments for parking, food and other services by customers seeking to purchase infringing recordings.

Cherry Auction nevertheless contends that these benefits cannot satisfy the financial benefit prong of vicarious liability because a commission, directly tied to the sale of particular infringing items, is required. They ask that we restrict the financial benefit prong to the precise facts presented in *Shapiro,* where defendant H.L. Green Company received a 10 or 12 per cent commission from the direct infringers' gross receipts. Cherry Auction points to the low daily rental fee paid by each vendor, discounting all other financial benefits flowing to the swap meet, and asks that we hold that the swap meet is materially similar to a mere landlord. The facts alleged by Fonovisa, however, reflect that the defendants reap substantial financial benefits from admission fees, concession stand sales and parking fees, all of which flow directly from customers who want to buy the counterfeit recordings at bargain basement prices. The plaintiff has sufficiently alleged direct financial benefit.

Our conclusion is fortified by the continuing line of cases, starting with the dance hall cases, imposing vicarious liability on the operator of a business where infringing performances enhance the attractiveness of the venue to potential customers. In *Polygram,* for example, direct infringers were participants in a trade show who used infringing music to communicate with attendees and to cultivate interest in their wares. 855 F.Supp. at 1332. The court held that the trade show participants "derived a significant financial benefit from the attention" that attendees paid to the infringing music. *Id.; See also Famous Music Corp. v. Bay State Harness Horse Racing and Breeding Ass'n,* 554 F.2d 1213, 1214 (1st Cir.1977) (race track owner vicariously liable for band that entertained patrons who were not "absorbed in watching the races"); *Shapiro,* 316 F.2d at 307 (dance hall cases hold proprietor liable where infringing "activities provide the proprietor with a source of customers and enhanced income"). In this case, the sale of pirated recordings at the Cherry Auction swap meet is a "draw" for customers, as was

the performance of pirated music in the dance hall cases and their progeny.

Plaintiffs have stated a claim for vicarious copyright infringement.

### Contributory Copyright Infringement

■ Contributory infringement originates in tort law and stems from the notion that one who directly contributes to another's infringement should be held accountable. *See Sony v. Universal City,* 464 U.S. at 417, 104 S.Ct. at 774–776; 1 Niel Boorstyn, Boorstyn On Copyright § 10.06[2], at 10–21 (1994) ("In other words, the common law doctrine that one who knowingly participates in or furthers a tortious act is jointly and severally liable with the prime tortfeasor, is applicable under copyright law"). Contributory infringement has been described as an outgrowth of enterprise liability, *see* 3 Nimmer § 1204[a][2], at 1275; *Demetriades v. Kaufmann,* 690 F.Supp. 289, 292 (S.D.N.Y.1988), and imposes liability where one person knowingly contributes to the infringing conduct of another. The classic statement of the doctrine is in *Gershwin,* 443 F.2d 1159, 1162: "[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *See also Universal City Studios v. Sony Corp. of America,* 659 F.2d 963, 975 (9th Cir.1981), *rev'd on other grounds,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (adopting *Gershwin* in this circuit).

■ There is no question that plaintiff adequately alleged the element of knowledge in this case. The disputed issue is whether plaintiff adequately alleged that Cherry Auction materially contributed to the infringing activity. We have little difficulty in holding that the allegations in this case are sufficient to show material contribution to the infringing activity. Indeed, it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet. These services include, *inter alia,* the provision of space, utilities, parking, advertising, plumbing, and customers.

Here again Cherry Auction asks us to ignore all aspects of the enterprise described by the plaintiffs, to concentrate solely on the rental of space, and to hold that the swap meet provides nothing more. Yet Cherry Auction actively strives to provide the environment and the market for counterfeit recording sales to thrive. Its participation in the sales cannot be termed "passive," as Cherry Auction would prefer.

■ The district court apparently took the view that contribution to infringement should be limited to circumstances in which the defendant "expressly promoted or encouraged the sale of counterfeit products, or in some manner protected the identity of the infringers." 847 F.Supp. 1492, 1496. Given the allegations that the local sheriff lawfully requested that Cherry Auction gather and share basic, identifying information about its vendors, and that Cherry Auction failed to comply, the defendant appears to qualify within the last portion of the district court's own standard that posits liability for protecting infringers' identities. Moreover, we agree with the Third Circuit's analysis in *Columbia Pictures Industries, Inc. v. Aveco, Inc.,* 800 F.2d 59 (3rd Cir.1986) that providing the site and facilities for known infringing activity is sufficient to establish contributory liability. *See* 2 William F. Patry, Copyright Law & Practice 1147 ("Merely providing the means for infringement may be sufficient" to incur contributory copyright liability).

### Contributory Trademark Infringement

■ Just as liability for copyright infringement can extend beyond those who actually manufacture or sell infringing materials, our law recognizes liability for conduct that assists others in direct trademark infringement. In *Inwood Laboratories,* 456 U.S. 844, 102 S.Ct. 2182, the Court said that contributory trademark liability is applicable if defendant (1) intentionally induces another to infringe on a trademark or (2) continues to supply a product knowing that the recipient is using the product to engage in trademark infringement. *Inwood* at 854–55, 102 S.Ct. at 2188–89. As Cherry Auction points out, the *Inwood* case involved a manufacturer-

distributor, and the *Inwood* standard has generally been applied in such cases. The Court in *Inwood,* however, laid down no limiting principle that would require defendant to be a manufacturer or distributor.

The defendant in *Inwood* distributed drugs to a pharmacist, knowing that the pharmacist was mislabeling the drugs with a protected trademark rather than a generic label. In this case, plaintiffs correctly point our that while Cherry Auction is not alleged to be supplying the recordings themselves, it is supplying the necessary marketplace for their sale in substantial quantities.

In *Hard Rock Cafe,* 955 F.2d 1143, the Seventh Circuit applied the *Inwood* test for contributory trademark liability to the operator of a flea market. In that case, there was no proof that the flea market had actual knowledge of the sale by vendors of counterfeit Hard Rock Cafe trademark merchandise, but the court held that contributory liability could be imposed if the swap meet was "willfully blind" to the ongoing violations. *Hard Rock Cafe,* 955 F.2d at 1149. It observed that while trademark infringement liability is more narrowly circumscribed than copyright infringement, the courts nevertheless recognize that a company "is responsible for the torts of those it permits on its premises 'knowing or having reason to know that the other is acting or will act tortiously....'" *Id.* quoting Restatement (Second) of Torts § 877(c) & cmt. d (1979).

*Hard Rock Cafe's* application of the *Inwood* test is sound; a swap meet can not disregard its vendors' blatant trademark infringements with impunity. Thus, Fonovisa has also stated a claim for contributory trademark infringement.

The judgment of the district court is REVERSED and the case is REMANDED FOR FURTHER PROCEEDINGS.