Amy Totenberg, United States District Judge
This matter is before the Court on Defendant's Renewed Motion for Judgment as a Matter of Law [Doc. 170].
This case was tried before a jury from February 13, 2017 to February 28, 2017. At the close of evidence, Defendants moved for directed verdict in their favor *1341 on Plaintiffs' claim for contributory trademark infringement. The jury returned a verdict in favor of Plaintiffs and against Defendant Airport Mini Mall, LLC, ("AMM"), Yes Assets, LLC, Jerome Yeh, Donald Yeh, and Alice Jamison.[1] Defendants then filed this Renewed Motion for Judgment as a Matter of Law.
For the reasons that follow, Defendants' Renewed Motion for Judgment as a Matter of Law [Doc. 170] is DENIED .
I. STANDARD OF REVIEW
Under Fed. R. Civ. P. 50, "[a] party's motion for judgment as a matter of law can be granted at the close of evidence or, if timely renewed, after the jury has returned its verdict, as long as 'there is no legally sufficient evidentiary basis for a reasonable jury to find' " for the non-moving party. Chaney v. City of Orlando, Fla. , 483 F.3d 1221, 1227 (11th Cir. 2007) ; Lipphardt v. Durango Steakhouse of Brandon, Inc. , 267 F.3d 1183, 1186 (11th Cir. 2001). "Regardless of timing, however, in deciding on a Rule 50 motion a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." Chaney , 483 F.3d at 1227. Thus, in ruling on Defendants' renewed motion under Rule 50(b) after the jury has rendered a verdict, this Court's sole consideration is to assess whether the jury's verdict is supported by sufficient evidence. Id. ; see also Lipphardt , 267 F.3d at 1186. In assessing a motion under Rule 50, the Court must review the evidence adduced at trial in the light most favorable to the non-movant. Chaney , 483 F.3d at 1222-23.
II. DISCUSSION
Defendants have renewed their motion pursuant to Fed. R. Civ. P. 50(b), asserting they are entitled to judgment in their favor because (1) the Second Circuit's decision in Tiffany's v. Ebay controls the contributory liability analysis and requires evidence of specific notice of infringement; (2) Plaintiffs failed to demonstrate evidence of Defendants' willful blindness; (3) Plaintiffs failed to establish the individual liability of Jerome Yeh, Donald Yeh, and Alice Jamison via corporate veil piercing, or that the individual Defendants engaged in sufficient activities to create individual liability independent of their roles as officers or shareholders of Airport Mini Mall, LLC or Yes Assets, LLC.
A. The Tiffany v. Ebay Standard for Contributory Liability
Defendants first argue that the Court failed to apply the Tiffany v. Ebay standard requiring Plaintiffs to show Defendants possessed specific knowledge of the direct infringement by a specific tenant. In Tiffany , the Second Circuit Court of Appeals adopted a narrow interpretation of the Supreme Court's contributory infringement standard in Inwood Labs., Inc. v. Ives Labs., Inc. ,[2] and held:
For contributory trademark infringement liability to lie, a service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods. Some contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary.
*1342 Tiffany (NJ) Inc. v. eBay Inc. , 600 F.3d 93, 107 (2d Cir. 2010). According to Defendants, " Tiffany sets the standard for determining the legal issue of liability for contributory trademark infringement." (Mot. at 9.) But, the Second Circuit's decision in Tiffany is not binding on this Court.
Rather, this Court must follow the Eleventh Circuit's standards in Duty Free Americas, Inc. v. Estee Lauder Companies, Inc. and Mini Maid Servs. Co. v. Maid Brigade Sys., Inc. The Eleventh Circuit has recognized that liability for trademark infringement can extend beyond those entities that actually perform the acts of infringement, meaning a defendant can be liable if it "continues to supply its product [or service] to one whom it knows or has reason to know is engaging in trademark infringement." Duty Free Americas, Inc. v. Estee Lauder Companies, Inc. , 797 F.3d 1248, 1276 (11th Cir. 2015) (quoting Inwood Labs., Inc. v. Ives Labs., Inc. , 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) ); Mini Maid Servs. Co. v. Maid Brigade Sys., Inc. , 967 F.2d 1516, 1522 (11th Cir. 1992). To succeed on a claim for contributory trademark infringement in the Eleventh Circuit, a plaintiff must show that the defendant contributed to a third party's direct infringement either by knowingly inducing or causing the infringement, by materially participating in it, or in some other way working to bring it about-such as through the provision of a necessary service without which the infringement would not be possible. See Duty Free Americas, Inc. , 797 F.3d at 1277 ; Mini Maid Servs. Co. , 967 F.2d at 1521-22. The Eleventh Circuit is not alone, and Defendants selectively rely on Tiffany without acknowledging other relevant circuit authority addressing contributory liability in the context of a marketplace for goods akin to the Old National Discount Mall. E.g., Coach v. Goodfellow , 717 F.3d 498, 503-05 (6th Cir. 2013) ; Fonovisa, Inc. v. Cherry Auction, Inc. , 76 F.3d 259, 264-265 (9th Cir. 1996) ; Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc. , 955 F.2d 1143, 1148-49 (7th Cir. 1992).
Liability for contributory infringement necessarily depends upon the scope of the defendant's intent and knowledge of the infringement. See, e.g., Mini Maid Servs. Co. , 967 F.2d at 1522 (considering whether the alleged contributing defendant "intended to participate" in the infringement or "actually knew about" the infringement); see also Duty Free Americas, Inc. , 797 F.3d at 1277. The extent and nature of the infringement is relevant in determining the requisite knowledge for imposing contributory liability. Mini Maid Servs. Co. , 967 F.2d at 1522. "If the infringement is serious and widespread, it is more likely that" the defendant "knows about and condones" the infringing activity. Id. And "under appropriate facts, contributory trademark infringement might be grounded upon a [defendant's] bad faith refusal to exercise a clear contractual power to halt the infringing activities." Mini Maid Servs. Co. , 967 F.2d at 1522.
A landlord's knowledge of infringing conduct by its tenants may come from raids by law enforcement agencies, in addition to Plaintiffs' notice letters. Fonovisa , 76 F.3d at 264-265 (holding that operators of a swap meet who had reason to know of infringing activity after law enforcement officers raided the flea market and seized counterfeit merchandise may be held liable for contributory trademark infringement); Coach Inc. v. Swap Shop, Inc. , 916 F.Supp.2d 1271, 1279 (S.D. Fla. 2012) (finding owners and operators of a flea market were either willfully blind of Lanham Act violations or had actual knowledge of them where prior police raids and seizures of counterfeit bags and other *1343 products had occurred, operator was notified of violations, and trademark holder had sent investigators to flea market); Coach, Inc. v. Gata Corp. , 2011 WL 2358671, *9 (D. N.H. 2011) ("[O]nce law-enforcement agencies began raiding the Flea Market, arresting vendors, and seizing counterfeit merchandize, any lack of specific knowledge on defendants' part could only have resulted from willful blindness; those raids provided defendants with a veritable roadmap to infringing vendors and merchandise."); Omega SA v. 375 Canal, LLC , 12 CIV. 6979 (PAC), 2016 WL 7439359, at *3 (S.D.N.Y. Dec. 22, 2016) (rejecting interpretation of Tiffany as requiring knowledge of specific, identified infringers, and holding that "[n]otice as to the sale of a particular type of good, by an (unnamed) individual, at a specific location is comparable to the 'listings' required in Tiffany. Trademark owner's warning letters or law enforcement raids of the premises may give a service provider sufficient knowledge of specific infringements.")
Defendants argue that contributory liability attaches only if they had actual prior knowledge that specific tenants were selling counterfeit sunglasses, and that after having received specific notice of counterfeit sales by the identified tenants, Defendants failed to prevent additional sales by those tenants. According to Defendants, all of Plaintiffs' evidence at trial failed to establish their liability under these parameters. Defendants have simply repackaged their arguments previously rejected by the Court on summary judgment and in ruling on the pretrial motions in limine.
Defendants assert that neither the November 21, 2014 raid, nor Plaintiffs' December 2014 and April 2015 pre-suit notice letters, provided sufficient prior notice or warning to Defendants of counterfeit RayBan or Oakley sales by their tenants to establish contributory liability for trademark infringement. First, Defendants contend there is no evidence they were aware of any tenants selling counterfeit Ray-Ban or Oakley merchandise before the November 2014 raid. Plaintiffs, however, offered evidence demonstrating that Defendants knew, or had reason to know, about the raids, seizures, and arrests of the tenants at the Discount Mall related to counterfeit sales of Luxottica and other luxury brand merchandise.[3] For example, Plaintiffs introduced evidence of an April 5, 2013 search warrant and arrest of the tenant at booths J9/K8 for selling counterfeit merchandise, *1344 including counterfeit Oakley and Ray-Ban items. (Pls.' Exs. 656, 848.) College Park Police Detective, Dustin Matthews, testified that he notified the Discount Mall security officer of the warrant and arrest and left a copy of the search warrant and inventory list of what was seized at the booth. (TR Vol II at 273-75, 285-86, Doc. 179.) Defendants renewed the lease for this tenant at booths J9/K8 in 2014. (Pls.' Ex. 196.)
Defendants further contend that even after the raid and their receipt of Luxottica's December 2014 notice letter, they still had no notice of which tenants were alleged to be engaging in infringing sales. The November 21, 2014 raid of the Discount Mall was central to the evidence presented at trial. The jury heard evidence that officers from the College Park Police Department and United States Department of Homeland Security raided the Discount Mall after a series of prior undercover buys indicated a significant amount of counterfeit goods were being openly sold by multiple mall vendors. (Pls.' Ex. 849, 528, 535.) More than a dozen tenants were arrested and nearly 3,500 counterfeit Ray-Ban and Oakley items were seized. (Id. ) Defendants' onsite property manager for the Discount Mall, Greg Dickerson testified that he learned that arrests were made during the raid, and personally witnessed the tenants being escorted from the building, placed in handcuffs, and driven away in police vehicles. (TR, Vol VII at 1172-73, Doc. 184.) After the raid, Dickerson spoke with his tenants who indicated they were arrested for possible counterfeiting. (Id. at 1176-77, 1183-84.) Dickerson worked with his security personnel who were present inside the Discount Mall the day of the raid to put together a "rough list of what appeared to be businesses that were impacted"-meaning a list of the tenant booths from which counterfeit merchandise was seized including a list of the merchandise that was seized. (Id. at 1179-80.) Dickerson also admits to receiving both of Luxottica's cease and desist letters: (i) the December 2014 letter expressly placing Defendants on notice that their tenants were engaged in selling counterfeit Luxottica merchandise; and (ii) the April 2015 letter that specifically identified booths A-6, B-8, E-8 and J-13-15.
The evidence, including Dickerson's testimony, is sufficient to demonstrate that Defendants had notice that certain identified tenants were known to sell counterfeit Luxottica merchandise, contrary to Defendants' assertions now that they had no such notice. Accordingly, the Court DENIES Defendants' Motion for Judgment as a matter of law on the basis that Plaintiffs failed to present sufficient evidence under governing law that Defendants had the requisite prior knowledge of their tenants' infringing sales to support a finding of contributory liability for trademark infringement.[4]
B. Evidence of Defendants' Willful Blindness
Defendants acknowledge in their motion that "willful blindness may be sufficient to establish a contributory trademark infringement claim." (Doc. 170-1 at 11.) They assert, however, that while a defendant can be found liable if he suspects wrongdoing and deliberately fails to investigate, a defendant cannot be found liable *1345 for failing to take reasonable precautions against sales of counterfeit items. (Id. )
On the issue of contributory infringement and willful blindness, the Court instructed the jury as follows:
A defendant has no affirmative duty to take precautions against the sale of counterfeit goods or to seek out and prevent alleged trademark violations and cannot be found liable if he or she simply fails to take reasonable precautions against sales of counterfeit items. As explained above, however, a defendant may be contributorily liable for infringement if the defendant continues to supply its services including but not limited to space, utilities, parking, advertising and customers to any tenant/vendor whom the defendant either knew or had reason to know was selling, offering for sale, or distributing products bearing counterfeits of Plaintiffs' trademarks.
...
"Willful blindness" means that the landlord or its agents had reason to suspect that counterfeit goods were being offered or sold, but deliberately failed to investigate, or looked the other way to avoid seeing such activity. Willful blindness may be sufficient to establish a contributory trademark infringement claim, but mere negligence is not. Willful blindness asks what the defendant suspected and what he did with such suspicion. Thus, a defendant can be found liable for contributory trademark infringement if he or she suspects wrongdoing and deliberately fails to investigate.
(Doc. 155 at 14, 16.)
Defendants assert they are entitled to judgment as a matter of law in their favor based on evidence that: (1) Defendant AMM prohibited the sale of counterfeit items in all tenant leases; (2) Defendants' manager, Greg Dickerson, spoke to the tenants after receiving Luxottica's letters and was assured that the tenants' sunglasses were legitimate; (3) Defendants' attorney met with the tenants in December 2014 and informed them that the sale of counterfeit items was prohibited and that AMM would take legal action to dispossess any tenant if AMM received evidence it could use in a court to prove a tenant's sale of counterfeit goods; (4) In January 2015, AMM distributed flyers to tenants reminding them that the sale of counterfeit items was prohibited; (5) Upon receipt of Luxottica's April 2015 letter, Dickerson directed tenants to remove all Ray-Ban and Oakley sunglasses or provide evidence they were an authorized dealer; (6) Defendants sought assistance from Plaintiffs' investigator, Geanie Johansen, to identify tenants who were selling counterfeit merchandise and to dispossess those tenants; (7) Plaintiffs refused to provide requested assistance in October/November 2015 in dispossessing a tenant identified by Defendants as selling counterfeit sunglasses; and (8) Defendants sought assistance from law enforcement to secure records and information regarding counterfeiting but received no such assistance. According to Defendants, they were improperly found liable for what in essence amounted to negligence based on their lack of expertise to distinguish counterfeit merchandise.
Defendants' motion, however, fails to acknowledge other evidence presented at trial by Plaintiffs from which the jury could find Defendants were willfully blind to the infringing conduct of their tenants, that Defendants had reason to suspect and had knowledge of the counterfeit sales, and deliberately failed to take serious, corrective action in light of what was known from the various notice letters and law enforcement raids. Plaintiffs submitted evidence from which the jury could find that Defendants exhibited willful blindness by failing and refusing to take action to stop the *1346 counterfeit sales after dozens of their tenants were arrested and thousands of counterfeit items were seized by law enforcement during the November 2014 raid. Plaintiffs offered evidence that counterfeit merchandise continued to be openly displayed for sale on multiple occasions in the Discount Mall after Mr. Dickerson claims he met with the tenants. (Pls.' Exs. 551, 536, 537, 539, 554-560, 669.)
Luxottica's notice letters advised Defendants that "If, while policing your property, you see a product bearing [Luxottica's] marks, it is a counterfeit product. Luxottica does not offer its merchandise for sale through individuals, street vendors, unauthorized retail locations, or flea markets." (Doc. 1-1 at 2.) At trial, Mr. Dickerson admitted that he disregarded this information because he asserted he had no specific proof that the tenants' merchandise was counterfeit. (TR, Vol VIII at 12118-22, Doc. 185.) He acknowledged, however, that he believed there was a possibility the tenants were selling counterfeit merchandise, but that Defendants maintained the position that they would not take action to evict the tenants without a criminal prosecution being taken against the tenants by the merchandise brand owners (i.e. Luxottica). (TR, Vol VII at 1183-84, Doc. 184; TR, Vol VIII at 1252-53, Doc. 185.) Plaintiffs introduced evidence that Defendants repeatedly renewed the leases of tenants who Defendants had notice were found to have engaged in repeated counterfeit sales, including tenants who were arrested or whose merchandise had been seized during the November 2014 raid. (See Pls.' Exs. 209-212, 215, 216, 218, 219 and 224.) Luxottica also introduced evidence that its undercover investigators returned to the Discount Mall on several occasions in 2015 and made purchases of counterfeit Ray-Ban and Oakley merchandise and that another raid in 2016 resulted in the seizure of thousands of counterfeit items bearing Luxottica's trademarks.
As Luxottica advised in the pre-suit notice letters, a landlord may be held liable for contributory trademark infringement by continuing to lease space to a tenant whom it knows or has reason to know is engaging in trademark infringement even without direct control over the infringing conduct. See Duty Free Americas, Inc. , 797 F.3d at 1277 ("under appropriate facts, contributory trademark infringement might be grounded upon a [defendant's] bad faith refusal to exercise a clear contractual power to halt the infringing activities"); see also Goodfellow , 717 F.3d at 503-05 (holding that a flea market owner and operator who "provide[d] ... rental booths and storage units for vendors" was contributorily liable when he had reason to know of trademark infringement committed by some vendors ); Fonovisa , 76 F.3d 259 at 265 (noting that "it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the [flea market] ... includ[ing], inter alia , the provision of space, utilities, parking, advertising, plumbing, and customers"); Hard Rock Cafe Licensing Corp. , 955 F.2d at 1148-49 (applying common law tort doctrines to claim for contributory infringement and stating that a landlord "is responsible for those it permits on its premises 'knowing or having reason to know that the other is acting or will act tortiously' ").
The Court instructed the jury that Defendants could be found contributorily liable for infringement if they possessed the power and authority to exercise control over the means of their tenants' sale of counterfeit merchandise, i.e., that Defendants possessed the right, ability or authority to control either (i) the use of the physical retail space that it rented at the Discount Mall, or (ii) the activities that any of its vendors could engage in while occupying *1347 such space at the Discount Mall. The Court further instructed the jury on the following provisions of Georgia commercial landlord/tenant law:
[U]nder Georgia law, if, under the terms of a commercial lease, a landlord has the right to terminate a lease for breach of rules established by the lease, for specific reasons identified in the lease, or if it has the right to reenter and take possession of the premises immediately or within a specified number of days advance notice, the landlord may do so without filing or going through a dispossessory proceeding in court if this can be accomplished. A landlord is therefore entitled to rely upon default provisions in a commercial lease agreement, which gives him the right to terminate the lease or reenter and take possession without resort to legal proceedings or a dispossessory proceeding, and he properly acts pursuant to the terms of lease in reentering and taking possession of premises upon default by tenants, without being subject to liability to the tenant for trespass, breach of implied covenant of quiet enjoyment of the premises, or breach of terms of lease agreement. A landlord similarly has the right to terminate or decline to renew a commercial property lease at its date of conclusion and then reenter and take possession of the premises without filing or resort to a dispossessory proceeding, so long as he can take possession without a breach of the peace. A breach of the peace is a violation or disturbance of the public tranquility and order. If a commercial landlord is unable to reenter the premises and take possession without a breach of the peace, he is required to file a dispossessory lawsuit.
(Doc. 155 at 18-19.)
Plaintiffs presented evidence that Defendants had the authority under the terms of their lease agreements to evict a tenant, terminate a tenant's lease, or decline to renew a tenant's lease based on the tenant's sale of counterfeit merchandise in violation of the lease provisions prohibiting such sales. The lease terms did not require a criminal conviction for counterfeiting or formal dispossessory proceedings as conditions before Defendants could exercise their lease remedies.
Based on the totality of the evidence at trial, not just Defendant's one-sided version, a reasonable jury could find either for or against the Defendants as to whether it took real action, whether the Defendants were willfully blind and failed to properly investigate whether the goods their vendors were selling were authentic or counterfeit, even though they had good reason to suspect that the goods were likely counterfeit. A reasonably jury could have found that Defendants' choice not to exercise their rights under the lease and Georgia law was the result of their blind acceptance of the tenants' denial of the allegations and their hands-off approach in the face of evidence of repeated and systemic acts of infringement within the Discount Mall. Or, A reasonable jury could have found from the evidence at trial that Defendants took sufficient measures to prevent the sale of counterfeits at their Discount Mall.
As the Court finds the evidence sufficient to support a jury determination of contributory infringement based on a failure by Defendants to take action against the tenants within the bounds of their leases to address the continued sale of counterfeit goods, Defendants' Motion for Judgment as a Matter of Law is DENIED.
C. Corporate Veil Piercing is Not Required to Demonstrate Individual Liability for Trademark Infringement
Finally, Defendants argue that the Individual Defendants are entitled to *1348 judgment as a matter of law in light of the Court's error in ignoring Georgia law that individuals cannot be held liable on an alter-ego or corporate veil piercing theory.[5] Defendants contend that Plaintiffs failed to (i) establish that the Individual Defendants were the alter egos of Yes Assets and AMM, (ii) failed to introduce evidence that Defendants were insolvent, (iii) failed to establish that the corporate form should be disregarded, and (iv) failed to show that the Individual Defendants either had a duty, or breached a duty to Plaintiffs.
Georgia law, however, does not govern the Individual Defendants' liability for contributory trademark infringement under the Lanham Act. Corporate officers can be held personally liable for contributory trademark infringement without piercing the corporate veil. Babbit Elecs. Inc. v. Dynascan Corp. , 38 F.3d 1161, 1184 (11th Cir. 1994) ("[A] corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing the corporate veil."); Chanel, Inc. v. Italian Activewear of Fla., Inc. , 931 F.2d 1472, 1477 (11th Cir. 1991) (stating that individuals, as well as corporations, may be liable for trademark infringement under the Lanham Act because obviously a corporation acts through an individual and if the corporation is responsible for infringement that infringement was done by someone, either an employee or an officer of the corporation). The "individual liability standard does not ask whether the individual participated or engaged in some infringing act; instead, it asks whether he actively participated as a moving force in the decision to engage in the infringing acts, or otherwise caused the infringement as a whole to occur." Chanel , 931 F.2d at 1478 n. 8. As Defendants' arguments in support of their Motion for Judgment as a Matter of Law are irrelevant, the Motion is DENIED .[6]
III. CONCLUSION
For the foregoing reasons, the Court DENIES Defendants' Renewed Motion for Judgment as a Matter of Law. The jury's verdict stands.
IT IS SO ORDERED this 19th day of December, 2017.

The jury found Defendant Jenny Yeh was not liable to Plaintiffs.

See Inwood Labs., Inc. v. Ives Labs., Inc. , 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (holding that "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one who it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit").

Defendants' property manager, Greg Dickerson, also testified that (a) he spoke with an investigator from Nike in 2014 regarding counterfeit Nike products being sold by tenants, and (b) he had received cease and desist letters from Coach and Louis Vuitton following law enforcement raids in which counterfeit products were seized and tenants were arrested. (TR, Vol. VII at 1157-1158, Doc. 184; TR, Vol VIII at 1241-44, 1248-52 Doc. 185.) Because "evidence of serious and widespread counterfeiting" is relevant to determine whether Defendants knew, or had reason to know, their tenants were engaging in infringing sales activities, the Court admitted some evidence at trial of law enforcement raids at the Old National Discount Mall (during Defendants' ownership and management of the shopping center) and cease and desist letters from manufacturers of luxury goods (such as Coach and Louis Vuitton) regarding the sale of counterfeit merchandise by Defendants' tenants. The Court found this evidence of the alleged pervasive nature of counterfeiting at the Discount Mall was relevant to establish the scope of Defendants' knowledge and the level of control they exercised over their property and the conduct of their tenants. See Mini Maid Servs. Co. , 967 F.2d at 1522 ; see also Luxottica Grp., S.p.A. v. Greenbriar Marketplace II, LLC , 212 F.Supp.3d 1375, 1384-85, n.9 (N.D. Ga. Sept. 30, 2016). Evidence that Defendants were aware of a global counterfeiting problem as a whole at the Discount Mall supports a claim for contributory liability under governing Eleventh Circuit precedent in conjunction with the specific evidence offered as to sales of Luxottica counterfeit product at the Discount Mall. Id.

Defendants' additionally argue that the "trademarks found on items that were seized or purchased when Defendants did not have the requisite level of knowledge under Tiffany cannot count when calculating damages awarded to Plaintiffs." Having found that Tiffany does not set forth the controlling standard in this circuit for establishing contributory infringement liability, the Court rejects Defendants' additional argument geared toward damages.

Despite alleging that "Yes Assets, LLC and Airport Mini Mall, LLC are not only the alter egos of each other, but of the Individual Defendants, all of whom operate and manage the Discount Mall," Plaintiffs never asserted an alter ego theory of liability in this case. (Am. Compl., Doc. 63 ¶ 11.)

Defendants' one-sentence reference to the lack of facts at trial to show the Individual Defendants were the "moving force" behind the infringement is insufficient to demonstrate their entitlement to judgment under Rule 59 especially given the volume of evidence indicating the intertwinement of the Defendants individual finances with Yes Assets and AMM.