A & M RECORDS, INC., a Delaware Corporation; Arista Records, Inc., a Delaware Corporation; Atlantic Recording Corporation, a Delaware Corporation; BMG Music, a New York Partnership; Capitol Records, Inc., a Delaware Corporation; Elektra Entertainment, Inc., a Division of Warner Communications, a Delaware Corporation; Giant Records, a California Partnership; Fonovisa, Inc., a California Corporation; Island Records, Ltd., a United Kingdom Corporation; LaFace Records, a Joint Venture Partnership; Liberty Records; a Division of Capitol Records, Inc., a Delaware Corporation; MCA Records, Inc., a California Corporation; Motown Record Company, L.P., a California Limited Partnership; Polygram Records, Inc., a

---

Delaware Corporation; Profile Records, Inc., a New York Corporation; Qwest Records, a California Corporation; Sony Discos Inc., a Florida Corporation; Sony Music Entertainment Inc., a Delaware Corporation; Tommy Boy Music, Inc., a New York Corporation; Virgin Records America, Inc., a California Corporation; Warner Bros. Records Inc., a Delaware Corporation; WBR/Sire Ventures Inc., dba Sire Records Ltd., a Delaware Corporation; WEA International Inc., a Delaware Corporation; WEA Latina Inc., a Delaware Corporation; Word, Inc., a Texas Corporation; and Zomba Recording Corporation, a New York Corporation, Plaintiffs,

v.

General Audio Video Cassettes, Inc., a California Corporation; Moses Abel Plastics Mfg. Co., an Entity of Unknown Type; Mohammad ABDALLAH, an Individual; Apel Darakdjian, a/k/a Abu Hanea, an Individual; Faustino Villa, an Individual; Rizik Muslet, an Individual; Mohammed Alabed, a/k/a Abu Sereia, an Individual; Jose Manzano, an Individual; Mohammand Issa Halisi, a/k/a Abu Issa; and Does 1 Through 100, Inclusive, Defendants.

No. CV 94–1180–LEW.

United States District Court,
C.D. California.

March 21, 1996.

As Amended Nunc Pro Tunc Nov. 21, 1996.

Russell J. Frackman, Robert C. Welsh, Yakub Hazzard, Mitchell, Silberberg & Knupp, Los Angeles, CA, for plaintiffs.

Michael S. Magnuson, Whittier, CA, for defendant.

## AMENDED JUDGMENT *

LAUGHLIN E. WATERS, Senior District Judge.

### I. Background:

On February 24, 1994, twenty-six major record companies sued numerous corporations and individuals, including Mohammed Abdallah, who were allegedly engaging in copyright and trademark infringement. The other defendants either failed to respond to the complaint or settled, but the case against Mr. Abdallah proceeded to trial. Mr. Abdallah is the president and sole owner of defendant General Audio Video Cassettes, Inc. ("GAVC"), a California corporation that sells blank audiotapes and duplicating equipment.[1]

Soon after the lawsuit began, Mr. Abdallah retained attorneys for himself and for GAVC, believing that his legal expenses would be reimbursed from an insurance policy that he owned. On June 15, 1995, one of his two attorneys of record requested to withdraw from the case, stating that Mr. Abdallah could no longer pay their fee according to the fee agreement due to "a change in circumstances." It was later revealed that Mr. Abdallah's insurance company had determined that the claims against Mr. Abdallah were not covered by his policy, and so refused to reimburse Mr. Abdallah for his fees.

Prior to making the motion to withdraw, Mr. Abdallah's first attorney sent a letter to Mr. Abdallah explaining that the motion for withdrawal would be made and advising Mr. Abdallah to retain new counsel. On July 11, 1995, this Court granted the motion for withdrawal, and warned Mr. Abdallah in its order that "failure to take appropriate action may result in serious legal consequences and you

---

* This Amended Judgment supersedes the Judgment filed March 21, 1996, and is to be filed *nunc pro tunc* as of that date. The amendment of the judgment does not in any way affect the disposition of this action.

1. GAVC was also named as a defendant in the case, but was not represented by an attorney at the time of trial. Since a corporation cannot proceed *pro se*, default was entered against GAVC.

might want to seek legal assistance." At this point trial was still eight months away, and Mr. Abdallah was fully aware of the need to retain new counsel.

On September 6, 1995, Mr. Abdallah's other attorney of record also withdrew from the case for the same reason. At this point, Mr. Abdallah and his corporation, GAVC, were unrepresented by counsel. However, nearly all of the discovery in the case had already been completed at that time.

Trial was set in the case for January 22, 1996, and so Mr. Abdallah had over five months to find and retain another attorney. However, his efforts were less than diligent, and he did not retain another attorney until January 9, 1996, less than two weeks before trial. This third attorney prepared Mr. Abdallah's pre-trial memoranda and trial documents, but was fired by Mr. Abdallah on January 15, 1996. The attorney stated that Mr. Abdallah had failed to cooperate with his attorney, refused to supply his attorney with essential information, and refused to follow his attorney's advice. Consequently, the third attorney moved to withdraw, and the Court granted that motion, again warning Mr. Abdallah that trial was only one week away and there would be no extension of the trial date.

On January 22, the morning of the trial, Mr. Abdallah showed up with a fourth attorney, who told the Court that he had just been retained and therefore required an extra week to examine the files and prepare for trial. The Court noted that the plaintiffs were prepared for trial and had expended resources to have all their witnesses ready that morning, and thus agreed to extend the trial date for a week if Mr. Abdallah reimbursed the plaintiffs for the expenses they had incurred in bringing their witnesses to court that day. Mr. Abdallah decided to proceed with the trial without an attorney.

Although it is unfortunate that Mr. Abdallah ended up representing himself at trial, he had been given numerous warnings of the dangers of self-representation and ample time in which to locate an attorney. Moreover, although Mr. Abdallah's case would probably have been presented more efficiently had he been represented by an attorney,

his self-representation did not affect the final result of the case. As detailed below, the plaintiffs presented overwhelming evidence of Mr. Abdallah's illegal conduct, both through testimony and documentary evidence. Mr. Abdallah's legal arguments were ably set out by his third attorney in pre-trial memoranda that were submitted just before that attorney was dismissed. Thus, there is no doubt that the outcome of the case would have remained the same even if Mr. Abdallah had been represented by an attorney at trial.

## II. Findings of fact

A. The following facts are undisputed by the parties and are thus accepted by this Court as true:

Plaintiffs are twenty-six major record companies in the United States, doing business in Los Angeles, California. Together they own the copyrights and trademarks for the 156 sound recordings and 24 trade names that are listed in Appendices A and B attached hereto.

Defendant Mohammed Abdallah is the president and sole owner of GAVC. GAVC is a California corporation doing business in California, with a branch office in New Jersey. GAVC sells empty cassette cartridges, spools of blank recording tape, audio duplicating equipment, and "time-loaded" audio tapes. A "time-loaded" audio tape is a tape that runs for a certain time period that is specified by the customer. For example, a customer would order 10,000 tapes with a playing time of 27 minutes and 45 seconds, and GAVC would then assemble 10,000 cassette tapes of that length out of blank recording tape and empty cassette cartridges using tape loading machines.

Between 1990 and 1992, GAVC sold time-loaded audio tapes to defendants Rizik Muslet, Mohammed Issa Halisi, and Mohammed Alabed. These individuals used the time-loaded audio tapes to illegally counterfeit the plaintiffs' copyrighted works, including the 156 titles listed in Appendix A. These individuals also packaged these counterfeit tapes in cassette cartridges using insert cards with the plaintiffs' trademarks. The counterfeit-

ers were never licensed to use the plaintiffs' copyrights or trademarks.

B. The Court finds the following facts to be true by a preponderance of the evidence, primarily from the testimony of Rizik Muslet and Asmar Chabbo, whom this Court found to give credible testimony:[2]

Audiocassette counterfeiters such as Mr. Muslet, Mr. Halisi, and Mr. Alabed must have blank cassettes timed to specific lengths in order to produce marketable counterfeit tapes. Tapes of standard lengths (e.g. 30 or 60 minutes) are unacceptable because they either cut off the music of the sound recording or leave large amounts of silent time on each side of the tape. Therefore, counterfeiters are dependent on suppliers such as GAVC to acquire blank tapes that are timed to the specific length of the sound recording that they wish to counterfeit.

In September of 1991, Mr. Muslet was searching for a new supplier of time-loaded tapes for his counterfeiting operation. He met with Mr. Abdallah and informed him about the nature of the counterfeit operation, and the two agreed on a price for blank time-loaded cassettes. Mr. Muslet also needed a new supplier for insert cards for the counterfeit tapes, and asked Mr. Abdallah to assist him in that regard. Mr. Abdallah said that he would have somebody contact Mr. Muslet,

and a few days later a supplier called Mr. Muslet having been referred by Mr. Abdallah.

Throughout their business relationship, Mr. Muslet sent Mr. Abdallah numerous "legitimate" tapes (i.e., non-counterfeit tapes of sound recordings) to time. Mr. Abdallah would time these cassettes and send them back to Mr. Muslet with the time of the cassette written on it. Mr. Muslet would then use these times when ordering blank tapes from Mr. Abdallah.

From September of 1991 to October of 1992, Mr. Muslet purchased over 300,000 blank cassettes and a tape duplicating machine from GAVC. In October of 1992, Mr. Muslet's counterfeiting operation was raided by the police and he was arrested.

Mr. Abdallah's knowledge of his customer's counterfeiting activities was also demonstrated by his conversations with his employee, Asmar Chabbo. Mr. Chabbo worked for GAVC from July 1990 until July 1992. During that period, he became Mr. Abdallah's office manager in GAVC's branch office in New Jersey. Mr. Chabbo testified that Mr. Abdallah explained to him that some of GAVC's customers used the blank time-loaded tapes to counterfeit legitimate sound recordings, and also explained the methods that his customers used to counterfeit tapes.[3]

---

2. Mr. Chabbo's credibility was vehemently attacked by Mr. Abdallah on two grounds. First, Mr. Abdallah noted that Mr. Chabbo received reimbursements from the record industry for the expenses he incurred when one of his depositions was taken, including plane fare to Los Angeles, various expenses during his stay in the area, and reimbursement for lost wages while away from home. These reimbursements were the subject of a comprehensive cross-examination by one of Mr. Abdallah's attorneys in a later deposition, and the Court viewed this cross-examination at length during trial. Overall, these reimbursements did not seem excessive and did not affect Mr. Chabbo's credibility with the Court.

Mr. Abdallah also challenged Mr. Chabbo's credibility by pointing out that Mr. Chabbo gave three separate depositions: the first supported his ultimate testimony at trial, but in the second one he rescinded his earlier testimony and claimed that he had only implicated Mr. Abdallah because the record company promised him payments of money in return. Later, Mr. Chabbo gave a third deposition, consistent with his first and with his ultimate trial testimony, again implicating Mr. Abdallah and claiming that he

had only exonerated Mr. Abdallah earlier because Mr. Abdallah had threatened him and his family. While admittedly these dramatic changes in testimony call Mr. Chabbo's credibility into question, this Court concludes that it is more likely than not that Mr. Chabbo's trial testimony was truthful and his statements during the second deposition were not. As noted below, Mr. Chabbo's trial testimony is supported by other, independent pieces of evidence, such as Mr. Chabbo's extensive familiarity with the counterfeiting industry after working for GAVC, and times written in Mr. Abdallah's handwriting on legitimate audiocassettes that were seized in a raid on one of his customer's warehouses.

3. This testimony is confirmed by Mr. Chabbo's extensive knowledge of counterfeiting activity after leaving GAVC's employment. It was undisputed that prior to working for GAVC, Mr. Chabbo had no contact with the audiotape counterfeiting industry, and yet one week after he left GAVC, he was able to provide authorities with a comprehensive list of names and addresses of counterfeiting operations around the country.

Mr. Chabbo further testified to Mr. Abdallah's relationship with Mohammed Halisi, GAVC's largest customer. At one point Mr. Abdallah mentioned that he was worried about the credit he had extended to Mr. Halisi, because Mr. Halisi had been raided by the police for counterfeiting activities and all his merchandise had been seized. On another occasion, Mr. Halisi complained to Mr. Abdallah that the time-loaded cassettes he had purchased from GAVC were too short for the "Michael Jackson cassette." These and other episodes related by Mr. Chabbo made it clear that Mr. Abdallah was aware of Mr. Halisi's illegal counterfeiting activities and yet still continued to supply him with time-loaded audio cassettes.

Mr. Chabbo also testified that Mr. Abdallah frequently timed new legitimate cassettes for his customers. Sometimes, as Mr. Muslet had previously explained, the customer would send in the legitimate cassette and Mr. Abdallah would time it, write the time on the cassette, and send the cassette back to the customer. On other occasions, the customer would send Mr. Abdallah the legitimate cassette and an order for time-loaded cassettes. Mr. Abdallah would then time the legitimate cassette and manufacture thousands of blank time-loaded cassettes based on the time of the legitimate cassette. The blank time-loaded cassettes were sent back to the customer along with the original legitimate cassette.

To support this contention, plaintiffs introduced numerous legitimate cassettes that had been seized from a raid on Mr. Muslet's warehouse. These cassettes had their time written on them in Mr. Abdallah's handwriting, as identified by both Mr. Chabbo and an independent handwriting expert. Thus, there was credible evidence from three different sources that Mr. Abdallah had timed legitimate cassettes for his customers. This fact strongly indicates that Mr. Abdallah knew what his counterfeiting customers were doing with the tapes that he sold them.

In conclusion, this Court finds that at least three of Mr. Abdallah's customers engaged in a substantial amount of counterfeiting and trademark infringement, including the 156 copyrighted sound recordings and 24 trade names listed in Appendices A an B, respectively. This Court further finds that the time-loaded cassettes which Mr. Abdallah sold to these customers was a material contribution to their counterfeiting activities, since audiotape counterfeiters must have blank tapes timed to specific lengths. Finally, and most critically, this Court concludes that Mr. Abdallah had actual knowledge of the counterfeiting and trademark infringement being done by his customers, and that, notwithstanding that knowledge, he continued to supply these customers with the time-loaded audiocassettes necessary to continue their counterfeiting activities.

There was no evidence that Mr. Abdallah or anyone at GAVC ever copied any sound recordings themselves.

### III. Conclusions of law

### A. Copyright infringement

 Since it is undisputed that Mr. Abdallah did not participate in any copyright or trademark violations directly, the plaintiff's only basis for liability rests on a theory of contributory liability. This theory was outlined in *Gershwin Publishing Corp. v. Columbia Artists Management,* 443 F.2d 1159, 1162 (2nd Cir.1971), which stated that "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another" is "equally liable with the direct infringer." [4] This theory of liability was adopted in the Ninth Circuit by *Universal City Studios v. Sony Corp. of America,* 659 F.2d 963, 975 (9th Cir.1981), *rev'd on other grounds,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Under *Gershwin,* a plaintiff must prove two elements in order to establish a

The only reasonable inference is that he learned this information while working for GAVC, and that if he knew of these counterfeiting activities, Mr. Abdallah did as well.

4. Regrettably, in copyright litigation, enforcement efforts seem ineffective. Misappropriation may often needlessly succeed. Thus, liability for contributory infringement is particularly appropriate here. Given the apparent division of labor in the counterfeit recording industry, the actions of contributory infringers make possible the wide dissemination of the infringing works.

case of contributory liability: 1) the underlying copyright violation; and 2) the defendant knowingly induced, caused or materially contributed to that violation.

The Ninth Circuit's most recent analysis of contributory copyright infringement is found in *Fonovisa v. Cherry Auction*, 76 F.3d 259 (9th Cir.1996). *Fonovisa* involved a swap meet where numerous vendors were selling counterfeit sound recordings. The owner of the infringed copyrights sued the company that organized the swap meet, claiming that the company was liable for contributory infringement. After the district court granted a motion by the defendants for failure to state a claim, Fonovisa appealed. The Ninth Circuit applied the Gershwin test, noting that both the underlying violation and the defendant's knowledge of that violation were properly pled. The only question was whether or not the defendant had "induce[d], cause[d], or materially contribute[d] to" the copyright violation. *Id.* at 264 (citing *Gershwin*). The Ninth Circuit held that merely "providing the site and facilities for known infringing activity is sufficient to establish contributory liability," *Id.*, and thus allowed the plaintiff's case to go to trial.

In the present case, the plaintiffs have established every element set out by *Gershwin*. As in *Fonovisa*, the underlying counterfeit activity is undisputed. This Court has concluded that Mr. Abdallah had actual knowledge of his customer's counterfeit activity and continued to provide them with time-loaded cassettes. And finally, the Court has found that Mr. Abdallah's provision of time-loaded cassettes was a material contribution to his customers' counterfeiting activities. Mr. Abdallah's contribution to the underlying counterfeiting activity seems at least as significant as the contribution made by the swap meet in *Fonovisa*. Therefore, the plaintiffs have successfully demonstrated that Mr. Abdallah is liable for contributory copyright infringement.

The defendant argues that the Supreme Court's decision in *Sony Corp. of America v. Universal City Studios*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) has altered the *Gershwin* test. In *Sony*, the plaintiffs argued that the sale of video cassette recorders ("VCR's") constituted contributory copyright infringement because the sellers had at least constructive knowledge that the VCR's were being used to illegally copy movies broadcast on television. The Supreme Court ruled against the plaintiffs, holding that "the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses." *Id.* at 442, 104 S.Ct. at 789. In the present case, Mr. Abdallah argues that, just as VCR's have legitimate, noninfringing uses, the time-loaded cassettes that he sold also have legitimate, noninfringing uses.[5]

This Court rejects the defendant's argument for three reasons. First, the Supreme Court developed the *Sony* doctrine by borrowing a concept from patent law, which provides that the sale of a "staple article or commodity of commerce suitable for substantial noninfringing use" cannot constitute contributory infringement. *See* 35 U.S.C. § 271(c) (1984); *Sony* at 439–40, 104 S.Ct. at 787–88). Arguably, the *Sony* doctrine only applies to "staple articles or commodities of commerce," such as VCR's, photocopiers, and blank, standard-length cassette tapes. Its protection would not extend to products specifically manufactured for counterfeiting activity, even if such products have substantial noninfringing uses. Second, even if the *Sony* doctrine does apply to items specifically designed for counterfeit use, *Sony* requires that the product being sold have a *"substantial"* noninfringing use, and although time-loaded cassettes can be used for legitimate purposes, these purposes are insubstantial given the number of Mr. Abdallah's customers that were using them for counterfeiting purposes.

Finally, even if *Sony* protected the defendant's sale of a product specifically designed

---

5. Mr. Abdallah testified that most of his customers used the time-loaded cassettes to record their own original works, such as church sermons, language classes, or advertisements. The plaintiffs did not dispute the fact that Mr. Abdallah had some legitimate customers for his time-loaded cassettes, although they claimed that the vast majority of his customers were counterfeiters.

for counterfeiters to a known counterfeiter, the evidence in this case indicated that Mr. Abdallah's actions went far beyond merely selling blank, time-loaded tapes. He acted as a contact between his customers and suppliers of other material necessary for counterfeiting, such as counterfeit insert cards; he sold duplicating machines to help his customers start up a counterfeiting operation or expand an existing one; he timed legitimate cassettes for his customers to assist them in ordering time-loaded cassettes; and he helped to finance some of his customers when they were starting out or needed assistance after a police raid. Therefore, even if *Sony* were to exonerate Mr. Abdallah for his selling of blank, time-loaded cassettes, this Court would conclude that Mr. Abdallah knowingly and materially contributed to the underlying counterfeiting activity.

## B. Trademark infringement

Again, the plaintiff's only possible theory of liability is one of contributory trademark infringement, since Mr. Abdallah himself never directly violated any of the plaintiffs' trademarks. The test for contributory trademark infringement is similar to that for contributory copyright infringement: a defendant is guilty of contributory trademark infringement if he or she (1) intentionally induces another to infringe on a trademark or (2) continues to supply a product knowing that the recipient is using the product to engage in trademark infringement. *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 854–55, 102 S.Ct. 2182, 2188–89, 72 L.Ed.2d 606 (1982); *Fonovisa,* 76 F.3d at 264. As noted above, the plaintiffs effectively demonstrated that Mr. Abdallah continued to supply a blank, time-loaded cassettes to his customers even though he knew that they used the cassettes to engage in trademark infringement, and therefore Mr. Abdallah is liable for contributory trademark infringement.

## IV. Damages

### A. Copyright infringement

Section 504 of the Copyright Act allows the plaintiffs to elect either statutory damages or actual damages for copyright infringement, and the plaintiffs in this case have elected statutory damages. 17 U.S.C. § 504(c)(1). The plaintiffs have also attempted to prove that Mr. Abdallah committed the infringement willfully, thus increasing the potential statutory damage award. 17 U.S.C. § 504(c)(2).

For the purposes of § 504(c)(2), a defendant acts willfully if he or she knew, had reason to know, or recklessly disregarded the fact that his or her conduct constituted copyright infringement. *See, e.g., Peer Int'l Corp. v. Pausa Records, Inc.,* 909 F.2d 1332, 1335–36 (9th Cir.1990). Given the fact that Mr. Abdallah continued in his business for a number of years with the knowledge that his customers were using his product to counterfeit sound recordings, combined with the fact that he continued selling to these counterfeiters even after his own business was raided at least three times by police, this Court concludes that at the very least Mr. Abdallah had a reckless disregard for whether or not his conduct violated copyright laws. Therefore, this Court finds that Mr. Abdallah is liable for willful infringement.

Section 504(c)(2) states that the Court may award statutory damages of up to $100,000 for each instance of willful infringement. The legislative history of the Copyright Act indicates that for the purposes of calculating damages, "[a] single infringer of a single work is liable for a single [award of statutory damages], no matter how many acts of infringement are involved in the action...." House Report No. 94–1476, at 162, quoted in 1976 U.S.Code Cong. & Admin.News 565, 577. Therefore, in calculating statutory damages, this Court must first determine the number of different works that Mr. Abdallah infringed upon, and multiply that number by the amount to be awarded for each infringement.

The plaintiffs have provided a list of 156 different sound recordings that Mr. Abdallah's customers had counterfeited. Although there is no direct evidence that Mr. Abdallah knew he was contributing to the illegal copying of each of these 156 different sound recordings, the testimony at trial indicated that Mr. Abdallah was aware that he was

contributing to the counterfeiting of many different sound recordings. Mr. Abdallah was aware that each legitimate sound recording that his customers were counterfeiting had its own unique length, and therefore every different length of time that was requested for his time-loaded cassettes represented a different copyrighted work that would be illegally counterfeited. Therefore, it would be impossible for Mr. Abdallah's customers to copy 156 different sound recordings, each with its own unique length, without Mr. Abdallah—or somebody at GAVC—knowing that 156 different sound recordings were being copied. Given this inference, the Court finds that Mr. Abdallah knowingly contributed to the copyright infringement of at least 156 different works.[6]

This Court finds that a statutory award of $1,000 is appropriate for each infringement, totalling $156,000 for all 156 copyright infringements established by the plaintiffs. Although this is a relatively small amount of statutory damages for each infringement, the total award is sufficiently substantial to fulfill the purposes of the statutory damages. Furthermore, as noted below, Mr. Abdallah is liable under the Lanham Act for triple the amount of his counterfeiting profits, so there is no danger of his profiting from his illegal activity.

### B. Trademark infringement

As a preliminary matter, the Court notes that the Ninth Circuit has held that if a defendant infringes upon a plaintiff's copyright and its trademark, the plaintiff can recover both statutory damages under the Copyright Act and actual damages under the Lanham Act. *Nintendo of America v. Dragon Pacific Int'l,* 40 F.3d 1007, 1011 (9th Cir.1994). As the Ninth Circuit pointed out,

the purpose of the statutory damages, particularly when the infringement was willful, is to penalize the infringer and deter similar conduct in the future. Actual damages under the Lanham Act are designed to compensate the trademark owner for its lost profit and prevent the defendant from unjust enrichment. Therefore, this Court will award actual damages under the Lanham Act for Mr. Abdallah's trademark violations.

The Lanham Act states that the plaintiff shall recover defendant's profits and any damages sustained by the plaintiff. The plaintiffs in this case produced no evidence of actual damages that they sustained, and therefore their damages for trademark infringement derive solely from Mr. Abdallah's profits from his illegal activity.

In determining the defendant's profits, the plaintiff bears the burden of proving the defendant's sales; the defendant must then prove any costs or deductions from the gross sales figure. The Act also states that the trial court "may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." Thus, the Court has the discretion to award up to treble damages for a Lanham Act violation. 15 U.S.C. § 1117(a). If the violation is found to be willful, the trial court should award treble damages unless it finds "extenuating circumstances."

The plaintiffs did not receive full cooperation from the defendants regarding GAVC's financial records, so they were forced to offer GAVC's bank statements as proof of GACV's gross sales for the period in question. According to these bank statements, GAVC received approximately $7.7

---

**6.** According to the evidence presented at trial, 156 separate instances of infringement is almost certainly a low estimate. These only represent the titles that were known to be copied by three of Mr. Abdallah's customers. It is highly likely that these three customers had counterfeited other works with Mr. Abdallah's assistance which were never detected by the plaintiffs. Furthermore, there was evidence that these three customers were not the only counterfeiters among Mr. Abdallah's clientele; by one witness' estimate, 70% of Mr. Abdallah's customers were engaged in counterfeiting. The witness also testified that Mr. Abdallah timed two or three legitimate cassettes a week for his customers, meaning that over the two or three year period covered by this lawsuit, Mr. Abdallah would have timed over 300 different legitimate cassettes and presumably sold blank time-loaded cassettes to copy each of those legitimate sound recordings, thereby contributing to over 300 different copyright infringements.

million for the period from 1991 to 1992.[7] This large figure is supported by other testimony of Mr. Chabbo, who stated that during certain periods of time, GAVC's California office would sell 150,000 cassettes a week to a single customer, as well as tape duplicating machines. When Mr. Chabbo was transferred to GAVC's New Jersey office, he testified to selling between 120,000 and 140,000 tapes a week. Testimony from one of Mr. Abdallah's customers indicated that each tape cost the buyer between 26 and 34 cents, depending on its length. These figures indicate that GAVC was grossing roughly $60,000 to $90,000 a week, which could easily account for over seven million dollars over two years.[8]

Mr. Abdallah offered no proof as to how much of these receipts were used for operating costs and expenses. Clearly GAVC had expenses, such as the raw materials required to construct the tapes, and the salaries of its various employees. However, the Court was not provided with any information as to the amount of these expenses, and GAVC was unwilling to disclose such information to the plaintiffs during discovery. In the absence of any details regarding GAVC's expenses, this Court is forced to estimate that 50% of GAVC's gross sales went to pay various expenses. Thus 50% of the $7.7 million, or $3.35 million, represents GAVC's total profit for the years in question.

The plaintiffs propose that 70% of this profit came from sales to illegitimate customers, based on Mr. Chabbo's estimate that 70% of GAVC's customers were engaged in counterfeiting activity. Since there was no other evidence on this point, this Court finds that 70% of these gross receipts were directly attributable to Mr. Abdallah's contributory trademark violations. GAVC's profit from its contributory counterfeiting activities for these two years was therefore approximately $2.34 million.

As noted above, the Lanham Act states that the trial court should award treble damages if the infringement was intentional unless "extenuating circumstances" exist. The Court finds no extenuating circumstances, and therefore triples the damages for trademark infringement, for a total of $7,000,000.

C. Attorney's fees and costs

▮▮▮▮ Under section 505 of the Copyright Act, this Court may award costs to either party in a copyright infringement action. Traditionally, a trial court will award costs to a party if the court determines that the opposing party acted in bad faith during the litigation. *See, e.g., Sanford v. Columbia Broadcasting Sys.*, 108 F.R.D. 42, 43 (N.D.Ill.1985). It is clear that Mr. Abdallah created undue difficulties for the plaintiffs by failing to respond to interrogatories in a timely fashion and refusing to turn over his own financial records.

However, there were more serious allegations of misconduct on the part of Mr. Abdallah. Mr. Chabbo, the plaintiffs' key witness, testified that Abdallah attempted to intimidate him into changing his story through threats of violence against him and his family. Mr. Chabbo claims that these threats did in fact lead him to change his story, causing him to relate a different set of facts in a second deposition. The intimidation was ultimately unsuccessful, since Mr. Chabbo subsequently changed his story back in time for a third deposition and the trial. Certainly if these allegations are true, Mr. Abdallah is guilty of bad faith during the litigation, and since this Court accepted the plaintiffs' version of Mr. Chabbo's story, it must conclude by a preponderance of the evidence that Mr. Abdallah engaged in some form of witness

7. The plaintiffs request that the Court consider all the deposits in GAVC's accounts for the four year period from 1991 to 1994. However, the plaintiffs only presented evidence of counterfeiting activity by three of GAVC's customers: Rizik Muslet, Mohammed Issa Halisi, and Mohammed Alabed. All three of these customers were raided by police in late 1992, so this Court will only consider the gross income up until 1992.

8. Although such accounting techniques are admittedly a crude method of determining damages, they have been approved in similar situations by the Ninth Circuit. *See Intel Corp. v. Terabyte Int'l*, 6 F.3d 614, 621 (9th Cir.1993). Furthermore, the defendant is to blame for any inaccuracies that result from such rough estimates, as he failed to provide any financial information about GAVC to the plaintiffs or to the Court.

tampering. This serious misconduct alone warrants the impositions of costs against Mr. Abdallah.

■■■ This Court has the discretion to award reasonable attorneys' fees to the prevailing party in a copyright infringement case. *See* 17 U.S.C. § 505. According to *Fogerty v. Fantasy,* 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), attorneys' fees should be awarded in such a case "only as a matter of the court's discretion." *Id.* at 534, 114 S.Ct. at 1033. The Supreme Court noted that the trial court should consider, *inter alia,* the losing party's "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 534 n. 19, 114 S.Ct. at 1033, n. 19. This Court has concluded that Mr. Abdallah intentionally contributed to the copyright infringement, and thus the Court imposes attorney's fees in order to deter others from such flagrant violations of the Copyright Act.

Furthermore, the Lanham Act also provides attorney's fees to a prevailing plaintiff if the infringement was intentional. 15 U.S.C. § 1117(b). Thus, the Lanham Act violations provide an independent reason for awarding the attorney's fees to the plaintiffs.

### D. Injunction

■■■ Under both the Copyright Act and the Lanham Act, prevailing plaintiffs are entitled to an injunction prohibiting the defendant from any further infringement of the plaintiffs' trademarks or copyrighted material. *See* 17 U.S.C. § 502(a); 15 U.S.C. § 1116. This Court finds that such an injunction is appropriate in this case.[9]

### V. Conclusion

For the foregoing reasons, this Court finds that defendant Mohammad Abdallah is liable for willful contributory copyright infringement in violation of the Copyright Act, and for contributory trademark infringement in violation of the Lanham Act. Accordingly, this Court awards statutory damages of $156,000 for 156 separate violations of the Copyright Act, and actual damages of $7,000,000 for violating the Lanham Act. The defendant is also enjoined from infringing or knowingly contributing to another's infringement of any of the plaintiffs' copyrights or trademarks.

Furthermore, Mr. Abdallah is responsible for the costs and reasonable attorneys' fees incurred by the plaintiffs during the course of this litigation. Plaintiffs are directed to submit to the Court an accounting of their attorneys' fees to determine the exact amount of the attorneys' fees award.

The above memorandum constitutes the Court's amended Findings of Fact and Conclusions of Law.

IT IS SO ORDERED.

APPENDIX A

| ARTIST | TITLE | RECORD CO. | SR NUMBER |
|---|---|---|---|
| Al B. Sure | Sexy Versus | Warner Bros. Records Inc. | SR 148–339 |
| Alejandra Guzman | Flor de Papel | Fonovisa, Inc. | SR 131–969 |
| Alyson Williams | Alyson Williams | Sony Music Entertainment Inc. | SR 141–149 |

**9.** The plaintiffs also seek an order that the defendants surrender all audio tapes and/or labels with plaintiffs' copyrighted sound recordings or trademarks, and all machines by which such audio tapes could be manufactured. Since there was no evidence that Mr. Abdallah participated in direct counterfeiting, nor that he owned any counterfeit tapes or labels, nor that he possessed any machines that were used for counterfeiting tapes, the Court finds that such an order would be inappropriate.

| | | | |
|---|---|---|---|
| Another Bad Creation | Coolin' at the Playground/Ya Know | Motown Record Company, L.P. | SR 133–678 |
| Arrested Development | 3 Years, 5 Months and 2 Days in the Life of . . . | Capitol Records, Inc. | SR 143–502 |
| Azucar Moreno | Mambo | Sony Discos Inc. | SR 134–526 |
| Banda Machos | Casimira | Fonovisa, Inc. | SR 144–611 |
| Barry White | Put me in Your Mix | A & M Records, Inc. | SR 136–533 |
| Bell Biv Devoe | WBBD—Bootcity Remix Album | MCA Records, Inc. | SR 136–580 |
| Bobby Brown | Bobby | MCA Records, Inc. | SR 146–137 |
| Bronco | 20 Exitos | Fonovisa, Inc. | SR 137–082 |
| Cafe Tacuba | Cafe Tacuba | WEA Latina Inc. | SR 146–305 |
| Candy Dulfer | Saxuality | BMG Ariola Benelux BV c/o Arista Records, Inc. | SR 137–766 |
| Cathy Dennis | Move to This | Polygram Records, Inc. | SR 145–759 |
| Chayito Valdez | 15 Exitos | Fonovisa, Inc. | SR 137–156 |
| Clint Black | The Hard Way | BMG Music | SR 143–756 |
| Color Me Badd | C.M.B. | Giant Records | SR 133–823 |
| Colores Santos | Cerati/Melero | Sony Discos Inc. | SR 148–276 |
| Crystal Waters | Surprise | Polygram Records, Inc. | SR 150–341 |
| Cypress Hill | Cypress Hill | Sony Music Entertainment Inc. | SR 134–573 |
| D.J. Jazzy Jeff & the Fresh Prince | Homebase | Zomba Recording Corporation | SR 133–152 |
| Da Lench Mob | Guerillas in Tha Mist | Atlantic Recording Corporation | SR 147–662 |
| Dana Dane | 4 Ever | Profile Records, Inc. | SR 144–521 |
| De La Soul | De La Soul is Dead | Tommy Boy Music, Inc. | SR 133–878 |
| Digital Underground | Sons of the P | Tommy Boy Music, Inc. | SR 146–286 |
| Digital Underground | This is an EP Release | Tommy Boy Music, Inc. | SR 143–698 |

| | | | |
|---|---|---|---|
| East Coast Family | East Coast Family Vol. 1 | Motown Record Company, L.P. | SR 148–383 |
| EMF | Schubert Dip | Capitol Records, Inc. | SR 129–831 |
| En Vogue | Funky Divas | Atlantic Recording Corporation | SR 140–315 |
| Expose | What You Don't Know | Arista Records, Inc. | SR 112–167 |
| Freddie Jackson | Do Me Again | Capitol Records, Inc. | SR 125–475 |
| Garth Brooks | Beyond the Season | Liberty Records | SR 144–511 |
| Garth Brooks | Garth Brooks | Capitol Records, Inc. | SR 134–583 |
| Garth Brooks | No Fences | Capitol Records, Inc. | SR 134–588 |
| Garth Brooks | Ropin' the Wind | Liberty Records (Formerly known as Capital Nashville) | SR 141–403 |
| Garth Brooks | The Chase | Liberty Records | SR 146–458 |
| George La Mond | Bad of the Heart | CBS Records Inc. | SR 121–462 |
| George Strait | Chill of an Early Fall | MCA Records, Inc. | SR 128–640 |
| George Strait | Livin' it up | MCA Records, Inc. | SR 120–085 |
| George Strait | Ocean Front Property | MCA Records, Inc. | SR 78–741 |
| George Strait | Pure Country | MCA Records, Inc. | SR 146–421 |
| Gerald Levert | Private Line | Atlantic Recording Corporation | SR 140–347 |
| Gilberto Santa Rosa | Punto de Vista | CBS Discos Inc. | SR 123–986 |
| Glenn Jones | Here I Go Again | Atlantic Recording Corporation | SR 139–609 |
| Gloria Estefan | Exitos de Gloria Estefan | Sony Discos Inc. | SR 131–652 |
| Grandmaster Slice | Electric Slide | Zomba Recording Corporation | SR 140–327 |
| Grupo Niche | Cielo de Tambores | Sony Discos Inc. | PENDING |
| Hammer | Let's Get it Started | Capitol Records, Inc. | SR 107–807 |
| Hammer | Too Legit To Quit | Capitol Records, Inc. | SR 136–387 |
| Heavy D & the Boyz | Big Tyme | MCA Records, Inc. | SR 105–848 |
| Heavy D & the Boyz | Peaceful Journey | MCA Records, Inc. | SR 133–370 |

| | | | |
|---|---|---|---|
| Ice–T | O.G. Original Gangster | WBR/Sire Ventures Inc. dba Sire Records Ltd. | SR 142–104 |
| Isley Brothers Featuring Ronald Isley | Tracks of Life | Warner Bros. Records Inc. | SR 144–158 |
| Jerry Rivera | Abriendo Puertas | Sony Discos Inc. | SR 131–779 |
| Jodeci | Forever My Lady | MCA Records, Inc. | SR 129–912 |
| Jody Watley | Affairs of the Heart | MCA Records, Inc. | SR 137–543 |
| Joe Public | Joe Public | Sony Music Entertainment Inc. | SR 138–625 |
| Joey Kid | Joey Kid | Atlantic Recording Corporation | SR 119–271 |
| Johnny Ventura | Extasis | Sony Discos Inc. | SR 171–361 |
| Jose Feliciano | Nina | Capitol Records, Inc. | SR 120–928 |
| Juan Gabriel | Juan Gabriel Con Mariachi | BMG Music | SR 22–325 |
| Juan Gabriel | Sus 15 Exitazos Originales | BMG Music | SR 39–90 |
| Juice Newton | Greatest Hits | Capitol Records, Inc. | SR 56–340 |
| K–Solo | Tell the World my Name | Atlantic Recording Corporation | SR 148–571 |
| K.M.D. | Mr. Hood | Elektra Entertainment | SR 129–711 |
| K–9 Posse | On a Different Tip | Arista Records, Inc. | SR 137–758 |
| Keith Sweat | I'll Give All My Love to You | Elektra Entertainment | SR 150–379 |
| Keith Sweat | Make it Last Forever | Elektra Entertainment (formerly known as Elektra/Asylum Records) | SR 86–761 |
| Keith Washington | Make Time for Love | Qwest Records | SR 133–368 |
| Kenny Rogers | Back Home Again | Warner Bros. Records Inc. | SR 138–161 |
| Kris Kross | Totally Krossed Out | Sony Music Entertainment Inc. | SR 141–411 |
| La Mafia | Estas Tocando Fuego | Sony Discos Inc. | SR 141–0073 |
| La Ley Del Corrido | Los Invasores de Nuevo Leon | Fonovisa, Inc. | SR 137–138 |

| | | | |
|---|---|---|---|
| Lalo Y Descalzos | Amor, Sudor, Y Lagrimas | WEA Latina Inc. | SR 144–134 |
| Lazet Michaels | Too Strong | BMG Music | SR 128–500 |
| Leaders of the New School | A Future Without a Past | Elektra Entertainment | SR 140–450 |
| Levert | Rope a Dope Style | Atlantic Recording Corporation | SR 123–757 |
| Liberacion | Con Mas Amor | Fonovisa, Inc. | SR 145–209 |
| Liberacion | Entre Nubes | Fonovisa, Inc. | SR 135–420 |
| Liberacion | Liberacion | Sony Discos Inc. (formerly known as Discos CBS International) | SR 41–692 |
| Lisa Fischer | So Intense | Elektra Entertainment | SR 148–461 |
| Londonbeat | In the Blood | MCA Records, Inc. | SR 126–560 |
| Los Bukis | 15 Exitos de Los Bukis | Fonovisa (formerly known as Profono International) | SR 59–458 |
| Los Yonics | 15 Aniversario | Fonovisa, Inc. | SR 137–371 |
| Los Traileros Del Norte | Amnesia | Fonovisa, Inc. | SR 144–682 |
| Los Mier | Con Mis Propias Manos | Fonovisa, In | SR 137–141 |
| Los Tigres Del Norte | Corridos Prohibidos | Fonovisa, Inc. | SR 105–540 |
| Los Traileros Del Norte | Corridos | Fonovisa, Inc. | SR 148–830 |
| Los Tigres Del Norte | Gracias America! | Fonovisa, Inc. | SR 149–924 |
| Los Bukis | Lo Mejor de Los Bukis Vol. 2 | Fonovisa, Inc. & Discos America | SR 114–236 |
| Los Traileros Del Norte | Los Traileros | Fonovisa, Inc. | SR 145–227 |
| Los Yonic's | Por Que Volvi Contigo? | Fonovisa, Inc. | SR 149–697 |
| Los Rodartes | Todo Por el Todo | Sony Discos Inc. | SR 146–167 |
| Los Mier | Viva el Amor! | Fonovisa, Inc. | SR 135–895 |
| Luther Vandross | Power of Love | Sony Music Entertainment Inc. | PENDING |

| | | | |
|---|---|---|---|
| Luther Vandross | The Best of Luther Vandross . . . The Best of Love | Sony Music Entertainment Inc. (formerly known as CBS Records Inc.) | SR 109–421 |
| M.C. Trouble | Gotta Get a Grip | Motown Record Company, L.P. | SR 121–437 |
| M.C. Brains | Lover's Lane | Motown Record Company, L.P. | SR 148–603 |
| Madonna | Like a Prayer | WBR/Sire Ventures Inc. dba Sire Records Ltd. | SR 106–808 |
| Manhattans | Manhattans Greatest Hits | Sony Music Entertainment Inc. (formerly known as CBS Records Inc.) | SR 25–977 |
| Mariah Carey | Emotions | Sony Music Entertainment Inc. | SR 134–831 |
| Martika | Martika | CBS Records Inc. | SR 98–698 |
| Mary J. Blige | What's The 411? | MCA Records, Inc. | SR 149–212 |
| Mas Dulce | Son De Azucar | Sony Discos Inc. | SR 141–081 |
| Metallica | Master of Puppets | Elektra Entertainment (formerly known as Elektra/Asylum) | SR 69–500 |
| Michel'le | Michel'le | Atlantic Recording Corporation | SR 111–287 |
| Millie Jackson | Young Man, Older Woman | Zomba Recording Corporation | SR 140–477 |
| Myriam Hernandez | Myriam Hernandez | WEA Latina Inc. | SR 144–023 |
| Najee | Just an Illusion | Capitol Records, Inc. | SR 144–167 |
| Natalie Cole | Unforgettable With Love | Elektra Entertainment | SR 138–520 |
| Natusha | Natusha & Condor Band | Capitol Records, Inc. | SR 133–100 |
| Naughty by Nature | Naughty by Nature | Tommy Boy Music, Inc. | SR 141–488 |
| Nino Segarra | Con La Musica Por Dentro | Musical Productions, Inc. | SR 117–576 |
| Pandora | Illegal | Capitol Records, Inc. | SR 147–048 |
| Patti La Belle | Burnin' | MCA Records, Inc. | SR 135–094 |

| | | | |
|---|---|---|---|
| Paula Abdul | Spellbound | Virgin Records America, Inc. | SR 129–900 |
| Peter Tosh | No Nuclear War | Capitol Records, Inc. | SR 94–394 |
| Poor Righteous Teachers | Pure Poverty | Profile Records, Inc. | SR 144–522 |
| Queen Latifah | Nature of a Sista | Tommy Boy Music, Inc. | SR 141–491 |
| Randy Travis | Greatest Hits Volume Two | Warner Bros. Records Inc. | SR 146–682 |
| Randy Travis | High Lonesome | Warner Bros. Records Inc. | SR 134–532 |
| Raphael | Ave Fenix | Sony Discos Inc. | SR 146–479 |
| Ready For The World | Straight Down To Business | MCA Records, Inc. | SR 131–212 SR 131–339 SR 132–471 |
| Reba McEntire | It's Your Call | MCA Records, Inc. | SR 148–324 |
| Red Head King Pin and the F.B.I. | Shade of Red | Virgin Records America Inc. | SR 106–334 |
| Rev. Milton Brunson & the Thompson Community Singers | My Mind is Made up | Word, Inc. | SR 143–598 |
| Ricky Van Shelton | Backroads | Sony Music Entertainment, Inc. | SR 132–469 |
| Roberto Carlos | Pajaro Herido | Sony Discos Inc. | SR 131–653 |
| Rocio Jurado | Sevilla | Sony Discos Inc. | SR 140–254 |
| Ron C | Back On The Streets | Profile Records, Inc. | SR 145–465 |
| Roy Hargrove | Public Eye | BMG Music | SR 129–493 |
| Rozenda Bernal | Yo Soy La Tamborera | Capitol Records, Inc. | SR 137–481 |
| Rude Boys | Rude House | Atlantic Recording Corporation | SR 145–748 |
| Safire | I Wasn't Born Yesterday | Polygram Records, Inc. | SR 136–085 |
| Sergio Vargas | Este es mi Pais | Sony Discos Inc. | SR 134–543 |
| Shabba Ranks | Rough & Ready- Volume 1 | Sony Music Entertainment Inc. | PENDING |
| Sheila E. | Sex Cymbal | Warner Bros. Records Inc. | SR 132–518 |

| | | | |
|---|---|---|---|
| Shirley Caesar | He's Working it Out For You | Word, Inc. | SR 138–294 |
| Shirley Caesar | Her Very Best | Word, Inc. | SR 79–037 |
| Sister Souljah | 360 Degrees of Power | Sony Music Entertainment Inc. | SR 141–396 |
| Snap | The Madman's Return | Arista Records, Inc. | SR 144–133 |
| Spice 1 | Spice 1 | Zomba Recording Corporation | SR 140–298 |
| Stephanie Mills | Home | MCA Records, Inc. | SR 106–887 |
| Susanna Hoffs | When You're a Boy | Sony Music Entertainment Inc. | SR 127–420 |
| Take 6 | So Much 2 Say | Warner Bros. Records Inc. | SR 132–407 |
| Techno Banda | Techno Banda | WEA Latina Inc. | SR 138–329 |
| Temptations | Give Love at Christmas | Motown Record Company, L.P. | SR 19–817 |
| Tevin Campbell | T.E.V.I.N. Campbell | Qwest Records | SR 137–686 |
| The UMC's | Fruits of Nature | Capitol Records, Inc. | SR 137–685 |
| The College Boys | Radio Fusion Radio | Virgin Records America, Inc. | SR 140–337 |
| The Sugarcubes | Stick Around for Joy | Elektra Entertainment | SR 144–079 |
| Tish Hinojosa | Homeland | A & M Records, Inc. | SR 106–824 |
| TLC | Ooooooh . . . On the TLC Tip | LaFace Records, Inc. | SR 143–726 |
| Tony Toni Tone | The Revival | Polygram Records, Inc. | SR 121–064 |
| Travis Tritt | T–R–O–U–B–L–E | Warner Bros. Records, Inc. | SR 146–731 |
| Triada | A Bailar | Sony Discos Inc. | SR 141–098 |
| U2 | Achtung Baby | Island Records Ltd. | SR 139–599 |
| UB 40 | Labour of Love II | Virgin Records America, Inc. | SR 112–173 |
| Vanessa Williams | The Comfort Zone | Polygram Records, Inc. | SR 141–365 |
| Various Artists | 12 Super Exitos de Los Cuatro de Mexico | Fonovisa, Inc. | SR 138–578 |

| | | | |
|---|---|---|---|
| Various | Exitos '92 | Sony Discos Inc. | SR 151–658 |
| Various | Gigantes Nortenos | Fonovisa, Inc. | SR 145–077 |
| Various | Invasion Nortena | Fonovisa, Inc. | SR 131–990 |
| Various | Juntos Con Amor | Fonovisa, Inc. | SR 131–995 |
| Various | Lo Nuestro Es— musical | Sony Discos Inc. | SR 136–215 |
| Various | "New Jack City"— Music From the Motion Picture | Giant Records | SR 139–902 |
| Various | Non Stop Dancing Vol. III | Sony Discos Inc. | SR 171 360 |
| Various | Pretty Woman | Capitol Records, Inc. | SR 120–103 |
| Various | Salsa en Grande | Sony Discos Inc. | SR 151–677 |
| Various | Son Para Ti ... Los Mejores Grupos | Fonovisa, Inc. | SR 145–107 |
| Various | We Wish You a Merry Motown Christmas | Motown Record Company, L.P. | SR 118–010 |
| Vickie Winans | The Lady | MCA Records, Inc. | SR 137–244 |
| Whitney Houston | I'm Your Baby Tonight | Arista Records, Inc. | SR 137–024 |
| Whodini | Bag–A–Trix | MCA Records, Inc. | SR 139–347 |
| Xclan | Xodus | Polygram Records, Inc. | SR 146–254 |
| Yndio | Romanticamente | Capitol Records, Inc. | SR 136–577 |

## APPENDIX B
## TRADE NAMES

A & M/A & M Records
Arista/Arista Records
Asylum/Asylum Records
Atlantic/Atlantic Records
Ariola/Ariola Records
BMG/BMG Music
Capitol/Capitol Records
CBS/CBS Records
Elektra/Elektra Records
Epic/Epic Records
EMI/EMI Records
Fonovisa
Giant/Giant Records
Island/Island Records
LaFace/LaFace Records
Liberty/Liberty Records

MCA/MCA Records
Motown/Motown Records
PolyGram/Polygram Records
Profile/Profile Records
Profono/Profono International
Qwest/Qwest Records
RCA/RCA Records
Reprise/Reprise Records