**ADOBE SYSTEMS INCORPORATED, a Delaware corporation, Plaintiff,**

**v.**

**CANUS PRODUCTIONS, INC., et al., Defendants.**

**No. CV00–02963DDPAJWX.**

United States District Court, C.D. California.

Oct. 23, 2001.

Ian N. Feinberg, L. Scott Oliver, Kimberly N. Van Voorhis, Gray Cary Ware & Freidenrich, Palo Alto, CA, for Adobe Systems Inc.

Eben L. Kurtzman, Eben L. Kurtzman Law Offices, San Jose, CA, for Canus Productions, Inc., National Productions, Inc, Computer Marketplace and Robert Joel Kushner.

## ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION

PREGERSON, District Judge.

This matter comes before the Court on the plaintiff's motion for partial summary judgment and a permanent injunction. After reviewing and considering the materials submitted by the parties, and hearing oral argument, the Court adopts the following order.

### I. Background

Adobe Systems Incorporated ("Adobe") is a leading software development and publishing company. The defendants Canus Productions, Inc., National Productions, Inc., and Computer Marketplace (collectively "National") are the proprietors of a number of weekly computer fairs

located primarily in southern California. Defendant Robert Kushner ("Kushner") is the founder and president of National. In this case, under the principles of vicarious liability and contributory infringement, Adobe seeks to hold National and Kushner liable for the sale of unauthorized Adobe software by vendors at National's computer shows.

National's computer shows offer computer hardware and software through individual vendors, each of whom contracts with National to secure a booth at the shows. National's larger shows, such as the Pomona Computer Fair, average up to 15,000 attendees per weekend. General admission fees range from free to $7 per person and are collected by National employees upon a customer's entrance to the show. Up to 90% of National's profits from the shows comes from admission fees and the booth fees charged to individual vendors. Once contracted, the vendors are free to distribute any computer-related products they choose. Each vendor signs a separate contract with National which provides, among other things, that "NPI [National] reserves the right to eject or cause to be ejected from the premises any objectionable person or persons." (Van Voorhis Decl., Ex. 2 at 60.) National does not receive a share of profits from any individual vendor. National provides some internal security for the computer fairs, as well as more extensive external security to monitor the entrances and the perimeter.

In April 1996, Adobe's counsel sent a letter to National describing the alleged infringing activities taking place at National's shows and requesting that National ensure that vendors selling unauthorized Adobe products would be ejected. Adobe alleges that National took no action at that time. Subsequently, Adobe representatives went to the Pomona Computer Fair in March 1999, and attempted to hand out flyers to attendees which stated that unau-

thorized Adobe products were being distributed at the show. National ejected these Adobe representatives from the premises, and informed Adobe that it was required to buy a booth in order to present flyers. According to National, Adobe was ejected because the activities of its representatives interfered with access to the entrances and posed a potential fire hazard. (Romo Decl. at p. 2.)

It is undisputed that on July 17, 1999, Adobe and the U.S. Marshal seized over one hundred units of various "unauthorized" Adobe software from a National show. The seized items included boxes containing genuine software manufactured by Adobe but with "Educational" or "Not–For–Resale" stickers removed or covered with a "Sale" or plain white sticker. The defendants do not raise the issue of whether these unauthorized products constitute copyright infringement. Adobe asserts that they do. Although the Court is somewhat dubious of Adobe's contention, the Court finds that this issue is not the focus of the motion and is best reserved for another day. The Court, therefore, will accept this argument as valid for purposes of the instant motion only. Adobe has also presented evidence that pirated software was seized, such as CD–ROMs in jewel cases with homemade product description jackets. Adobe contends, and National denies, that unauthorized Adobe products continue to be distributed at National's computer shows.

Adobe filed suit against National on March 23, 2000. Adobe now moves the Court for summary judgment on three claims in the First Amended Complaint: (1) that National, as proprietor of the Pomona Computer Fair and other local computer fairs, is vicariously liable for copyright infringement in that National obtained a direct financial benefit from the unauthorized distribution of Adobe

software and had control over the premises at which the infringing activities took place; (2) that National is liable for contributory infringement of Adobe's copyrights in that National knowingly provided a means for individual vendors to distribute Adobe software; and (3) that Kushner is liable for infringing acts of National under principles of agency and/or alter ego liability.

Adobe moves to permanently enjoin National from allowing individual vendors at any National-sponsored computer fair to distribute Adobe software, including Adobe software that National knows or should know to be unauthorized. Adobe also moves to enjoin National from ejecting from any National computer fair any Adobe employee or agent who has paid an admission fee.

## II. Discussion

### A. *Legal Standard for Summary Judgment*

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. *Id.* at 252, 106 S.Ct. 2505. In determining a motion for summary judgment, all reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Id.* at 242, 106 S.Ct. 2505.

### B. *Third Party Liability for Copyright Infringement*

Although the Copyright Act does not expressly impose liability on anyone other than direct infringers, courts have recognized that in certain circumstances, vicarious or contributory liability will be imposed. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 261 (9th Cir.1996); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (explaining that "vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individually accountable for the actions of another").

Two forms of third party liability for contributory infringement have been recognized in the case law: vicarious liability, derived from the similar concept in the law of employer-employee relations; and contributory infringement, derived from the tort concept of enterprise liability. *Polygram Int'l Publ'g v. Nevada/TIG, Inc.*, 855 F.Supp. 1314, 1320 (D.Mass.1994).

Contributory infringement requires that the secondary infringer "[k]now, or have reason to know" of direct infringement. *Cable/Home Communication Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845–46 & n. 29 (11th Cir.1990); *Religious Tech. Ctr. v. Netcom On–Line Communication Servs., Inc.*, 907 F.Supp. 1361, 1374 (N.D.Cal.1995) (framing issue as "whether [defendant] knew or should have known of" the infringing activities).

Vicarious liability exists when (1) a defendant has the right and ability to supervise the infringing conduct and (2) the defendant has an obvious and direct financial interest in the infringement. *Shapiro, Bernstein & Co. v. H.L. Green*

*Co.*, 316 F.2d 304, 307 (2d Cir.1963). Lack of knowledge of the infringement is irrelevant. *Id.* Vicarious copyright liability is an "outgrowth" of the common law doctrine of respondeat superior, which holds the employer liable for the acts of its agents. *Fonovisa*, 76 F.3d at 262.

*Shapiro* is the landmark case in which vicarious liability for sales of counterfeit recordings was expanded outside the employer-employee context. In *Shapiro*, the court was faced with a copyright infringement suit against the owner of a chain of department stores where a concessionaire was selling counterfeit recordings. Noting that the normal agency rule of respondeat superior imposes liability on an employer for copyright infringement by an employee, the Second Circuit articulated what has become the acknowledged standard for a finding of vicarious liability in the context of copyright infringement:

> When the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials—even in the absence of actual knowledge that the copyright monolpoly [sic] is being impaired ..., the purpose of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation.

*Shapiro*, 316 F.2d at 307 (internal citations omitted).[1]

### C. *National's Vicarious Liability*

*Fonovisa* is one of the first cases to address the issue of vicarious liability in the context of a trade show. In *Fonovisa*, a copyright owner sued the operators of the Cherry Auction swap meet, where third-party vendors routinely sold counterfeit recordings that infringed the plaintiff's copyrights and trademarks. The Ninth Circuit held that the plaintiff could maintain a cause of action against the swap meet operators for vicarious liability for copyright infringement. In order to state a claim for vicarious copyright infringement liability, the plaintiff must establish: (1) direct infringement of the plaintiff's copyright; (2) that the copyright infringement provides a direct financial benefit to the defendant; and (3) the defendant's right and ability to control the direct infringer. *See Fonovisa*, 76 F.3d at 262, 263.

### 1. *Direct Infringement*

■ For purposes of this motion, the defendants do not dispute that direct infringement occurred at a National show on July 17, 1999, where unauthorized versions of Adobe software were seized. In addi-

---

1. The *Shapiro* court looked at the two lines of cases it perceived as most clearly relevant. In one line of cases, the landlord-tenant cases, the courts held that a landlord who lacked knowledge of the infringing acts of its tenant and who exercised no control over the leased premises was not liable for infringing sales by its tenant. *See, e.g., Deutsch v. Arnold,* 98 F.2d 686 (2d Cir.1938). In the other line of cases, the so-called "dance hall cases," the operator of an entertainment venue was held liable for infringing performances when the operator (1) could control the premises and (2) obtained a direct financial benefit from the audience, who paid to enjoy the infringing performance. *See, e.g., Buck v. Jewell–La Salle Realty Co.,* 283 U.S. 191, 198–99, 51 S.Ct. 410, 75 L.Ed. 971 (1931). From these cases, the *Shapiro* court determined that the relationship between the store owner and the concessionaire in the case before it was closer to the dance-hall model than to the landlord-tenant model.

Other courts have continued to apply this paradigm to third-party infringement cases. In *Polygram*, for example, the court examined whether a trade show organizer is liable, either vicariously or as a contributory infringer, for the copyright violations of its exhibitors and entertainers. 855 F.Supp. at 1317–18. In that case, the court concluded that the defendant lay closer on the spectrum to the nightclub owner and department store than to the landlord, and imposed liability on the trade show operator.

tion, Adobe asserts that direct infringement is established because Adobe only licenses its software to consumers through a network of retailers and distributors. Therefore, Adobe claims, any individual vendor who distributes Adobe products without a license from Adobe—in particular, altered Adobe products—is per se liable for copyright infringement. *See, e.g., Adobe Sys. Inc. v. One Stop Micro, Inc.,* 84 F.Supp.2d 1086, 1093 (N.D.Cal.2000). Adobe claims the following additional evidence demonstrates that vendors sold unauthorized Adobe products at National's shows: (1) Adobe has acquired copies of adulterated, unauthorized Adobe Educational software from various vendors at National's Pomona Computer Fair as recently as June 1998 (Navarro Decl., ¶ 20); (2) vendors at National's computer fairs have distributed Adobe Educational software without first checking for a student identification as required by the Adobe OCRA (Navarro Decl., ¶¶ 17–19); and (3) Adobe has acquired numerous adulterated, unauthorized "Not For Resale" copies of its products at National shows (Navarro Decl., ¶¶ 11–16). Finally, Adobe asserts that Adobe has already sued and recovered against a number of individual vendors from the Pomona Computer Fair for infringing activities.[2]

National disputes that unauthorized Adobe products continue to be distributed at the defendants' shows. "To the best of Defendants' knowledge, there are no unauthorized products being distributed at [their] shows." (Def.'s Opp. at 5.) National admits that four to six vendors, out of at least 400 vendors, at the July 1999 fair may have engaged in activities that in-

fringed the plaintiff's copyrights. (*Id.* at 5:21–22, 8:16.)

The Court finds that there is no genuine issue of material fact that on July 17, 1999, vendors at National's Pomona Computer Fair sold unauthorized Adobe software. The Court finds that a genuine issue of material fact exists as to whether adulterated Adobe software is currently sold at National computer shows.

### 2. *Direct Financial Benefit*

Virtually all commercial landlords or trade show operators derive a direct financial benefit from the rents of their tenants or from the booth fees of vendors, as well as from the revenues associated with services provided to consumers at the venue such as parking and concessions. Strict liability for this entire class of commercial landlords cannot be the lesson of *Fonovisa.*

■ To satisfy the direct financial benefit prong of the vicarious copyright infringement test, *Fonovisa* holds that the sale of the counterfeit products must in fact be the "draw" for customers to the venue.[3] Under *Fonovisa,* the plaintiff bears the burden of demonstrating a direct financial benefit to the landlord from "customers seeking to purchase infringing recordings" and profits which "flow directly from customers who want to buy the counterfeit recordings." *Id.* The direct financial benefit must stem from the fact that substantial numbers of customers are drawn to a venue with the explicit purpose of purchasing counterfeit goods. In order to satisfy this prong, there must be "an obvious and direct financial interest in the

---

**2.** In an underlying action, CV 00–07091, Adobe sued and claims to have recovered against five vendors for these allegedly infringing activities.

**3.** *See Fonovisa,* 76 F.3d at 263–64 ("the sale of pirated recordings at the Cherry Auction

swap meet is a 'draw' for customers, as was the performance of pirated music in the dance hall cases and their progeny."); *see also Napster,* 239 F.3d at 1023 (affirming that "[f]inancial benefit exists where the availability of infringing material 'acts as a "draw" for customers' " (citations omitted)).

exploitation of copyrighted materials." *Shapiro*, 316 F.2d at 307. Without the requirement that the counterfeit goods provide the main customer "draw" to the venue, *Fonovisa* would provide essentially for the limitless expansion of vicarious liability into spheres wholly unintended by the court.

The facts of *Fonovisa* illustrate that the sale of pirated recordings at the Cherry Auction was the "draw" for customers to attend the swap meet. In *Fonovisa*, the scope of the copyright infringement that occurred at the weekly swap meets was vast. According to the district court's opinion, *Fonovisa Inc. v. Cherry Auction, Inc.*, 847 F.Supp. 1492, 1498 (E.D.Cal. 1994), the majority of Cherry Auction vendors sold counterfeit music tapes. A prelitigation raid by the Fresno County Sheriff's Department resulted in the seizure of more than 38,000 counterfeit recordings. The Ninth Circuit determined that there was no dispute that Cherry Auction was aware that vendors in its swap meet were selling counterfeit recordings. *See Fonovisa*, 76 F.3d at 261. The Court held that the defendants reaped "substantial financial benefits from admission fees, concession stand sales and parking fees, *all of which flow directly from customers who want to buy the counterfeit recordings at bargain basement prices*." *Id.* (emphasis added). Other benefits that accrued to Cherry Auction from the infringing sales included: "the payment of a daily rental fee by each of the infringing vendors; a direct payment to Cherry Auction by each customer in the form of an admission fee, and incidental payments for parking, food and other services *by customers seeking to purchase infringing recordings*." *Id.* (emphasis added).

In short, in *Fonovisa*, a symbiotic relationship existed between the infringing vendors and the landlord.[4] Cherry Auction became a venue for the distribution of large quantities of counterfeit recordings. This type of relationship involves more than a mere financial benefit to the landlord because the very success of the landlord's venture depends on the counterfeiting activity (and thus the landlord has every incentive to allow the activity to continue). This relationship between the activities of the counterfeiter and the overall success of the landlord's business enterprise is what is meant when the *Fonovisa* court stated that the infringement became the "draw" to the swap meet. 76 F.3d at 263–64.

It is therefore more concise to state that *Fonovisa* requires: (1) direct infringement of the plaintiff's copyright; (2) the defendant's right and ability to control the direct infringer; and (3) a direct financial benefit to the defendant from the "draw" of the infringing products. Plaintiffs must show that the vendor's infringement constitutes a draw to the venue to the extent that the economic interests of the direct infringer and those of the landlord become closely intertwined.

a. *Application*

■ Adobe argues that National meets the "direct financial benefit" requirement because National's trade shows are similar in organization to the Cherry Auction swap meet in *Fonovisa*. National charges vendors a daily admission fee in exchange for a booth, and makes money from customers' entrance fees as well as advertising fees collected from vendors. National distinguishes itself from Cherry Auction in that National gains no income from food,

---

4. In *Napster*, the court noted that the vicarious infringer's future revenue was "directly dependent" on increases in the direct infringer's user-base. 239 F.3d at 1024. "More users register with the Napster system as the 'quality and quantity of available music increases.'" *Id.* (citations omitted).

parking and other services but instead earns most (90%) of its income from booth space rental and attendance fees. National contends that it has no direct financial interest in the infringing activities because it receives no percentage of any sales or any compensation based on vendor sales at the shows. Under *Fonovisa*, this argument is irrelevant. Commissions on individual vendor sales is not required to support a finding of vicarious liability: booth and admission fees may suffice. *See Fonovisa*, 76 F.3d at 263.

The critical issue for purposes of this motion is whether unauthorized Adobe software is the "draw" for National's shows. Adobe contends that "prominent trade show vendors *admit* that low-priced Adobe software is a key to attracting customers" (Pl.Mot. at 8 (citing Van Voorhis Decl., Ex. 4) (emphasis in original)), and that National benefits through increased admission to its shows by customers in search of adulterated Adobe products (*see id.*). Adobe asserts that the "pirated software sold by vendors yields profits to National in the form of higher booth rental and admission revenue." (Adobe Reply at 8.) Adobe points to National's advertisements for "A Huge Inventory of PC Computer Products at Low Wholesale Prices!" (Van Voorhis Suppl.Decl., Ex. 2.) Adobe investigators have also purchased unauthorized products sold at discount prices.[5] In short, Adobe argues that the popularity of National's shows can be traced directly to the sale of unauthorized Adobe software, and that a portion of those profits flow directly to National. (Adobe's Reply at 1.)

National denies that customers attend its shows in order to purchase adulterated software, or that there is anything illegal about customers attending the shows to find bargains. National asserts that would also be harmed by such infringement because sales of counterfeit items: (1) damage the reputation of the show; and (2) cause a loss of attendees due to frustration about malfunction of illegal items. This detriment, National claims, explains why the penalty imposed for providing adulterated and infringing products is that the vendor is permanently expelled from National shows. In reference to the July 1999 raid, National argues that "less than two percent of the vendors selling less than one percent of the products for sale are involved in the allegedly infringing activity. It can hardly be said that this is a significant source of revenue or attraction for customers." (Defs, Opp. at 11.) Thus, although conceding that some infringing activity has occurred, National claims that such activity is on too small a scale to constitute a benefit to National in terms of increased attendance or draw to its shows.

■ Adobe's evidence that customers are drawn to National's shows by the lure of purchasing infringing software is insufficient to form the basis for a grant of summary judgment on this claim. Adobe has failed to demonstrate that no triable issue of fact exists as to whether the sale of infringing Adobe products at National computer shows is a direct "draw" for customers. National disputes that vendors use infringing Adobe software to attract business. The Court declines to accept the deposition of Phoung Nguyen as dispositive proof that infringing Adobe software is the key to drawing customers to National shows.[6] The fact that National

---

5. For example, Adobe investigators purchased a "Not–For–Resale version of Adobe Page-Maker 6.5 for ... $172" at a National fair in March 1999, a product that Adobe claims has a street value of $499. (Navarro Suppl.Decl., ¶ 6.)

6. The Court is also not convinced that Mr. Nguyen's deposition establishes that National uses the availability of unauthorized Adobe software as a major attraction to its show. Mr. Nguyen states only: "Well, since I only have kids software and it doesn't attract cus-

advertises that software is available for low prices or that consumers may go to National fairs to purchase bargain software does not establish that infringing Adobe software provides a significant draw for National's business.

In terms of direct financial benefit, this matter is not analogous to *Fonovisa,* where the swap meet was apparently saturated with counterfeit recordings, and, indeed, the swap meet's draw was to provide a venue for the purchase of counterfeit recordings. The facts of this case do not demonstrate that a symbiotic relationship existed between National and the infringing vendors such that National's success (or even existence) came to depend on the vendors' sales of infringing products. The Court finds that a triable issue of fact remains as to whether the infringing products constituted a draw.

### 3. *Right and Ability to Control*

In *Fonovisa,* the Ninth Circuit found that Cherry Auction had the right and the ability to control the vendors who sold the counterfeit recordings. Cherry Auction patrolled the small booths where the vendors operated; Cherry Auction's personnel promoted the swap meet; and Cherry Auction controlled customers' access to the booth area. Cherry Auction's right to police its vendors was established in a broad contract between the defendant and the vendors. Other factors which the Ninth Circuit considered relevant to Cherry Auction's degree of control included whether the defendant: (1) could control the direct infringers through its rules and regulations; (2) policed its booths to make sure the regulations were followed; and (3) promoted the show in which direct infringers participated. *Fonovisa,* 76 F.3d at 263.

In this case, the Court finds that National does not have an analogous right and ability to control its exhibitors. The amount of control necessary to support a finding of vicarious liability is fact-specific. As discussed above, the spectrum of control has, at one end, the landlord-tenant model, usually representing minimal ability of the premises owner to control the infringing activities of someone using his premises; and, at the other end, the employer-employee model, which represents maximum control by the premises owner. Such maximum control may be present either through a master-servant relationship or through "pervasive participation" in the business of the infringing party. *See id.* The Court finds that National does not possess the practical right and ability to control the sale of infringing products at its shows; and National does not act with "pervasive participation" in the business of the infringing vendors.

National does resemble Cherry Auction in a number of ways. National promotes its computer trade shows by: conducting advertising for its vendors and their products (thus creating an audience for the vendors at its shows); providing security services for the shows; and controlling customer access to the shows. National reserves the right to terminate vendors at any time in its contract with them: "NPI [National] reserves the right to eject or cause to be ejected from the premises any objectionable person or persons." (Van Voorhis Decl., Ex. 2.) In *Fonovisa,* Cherry Auction also retained the right to terminate vendors for any reason whatsoever, and therefore, the court held that the defendant had the ability to control the activities of the vendors on the premises. *Fonovisa,* 76 F.3d at 262. National employs

---

tomer[s], I figure, maybe I [would] go into Adobe and then Microsoft, something just to catch people['s] eyes for me to sell my children stuff." (Van Voorhis Decl., Ex. 4 at 65.)

National asserts that the vendor in question has been barred from shows because of the activity.

a team of security guards to monitor entrances, exits, and outside areas; and National arranges for some security inside the show, including two to five undercover security agents, who walk the floor and monitor issues such as booth placement, vendor disputes, and theft.[7] During the shows, Adobe alleges, National "actively polices the premises, all the while exercising its contractual right to eject anyone from the premises." (Adobe Mot. at 11.) Adobe claims that National's ability to control the premises and its vendors is further demonstrated by the fact that National ejected Adobe investigators from the Pomona Computer Fair in March 1999. The ability to eject vendors was the type of control that the *Fonovisa* court found partially determinative of Cherry Auction's ability to control. *See Fonovisa*, 76 F.3d at 263.

National contends, however, that it does not meet the *Fonovisa* "policing the booths" factor because the twenty security people who monitor access to the building and outside are not policing the booths. The internal security force consists of two to five security guards, and their mandate is broad. The function of the internal security guards is not geared toward locating infringing products, although if illegal products are spotted, these employees are instructed to take action. (*See* Van Voorhis Decl., Ex. 1 at 41.) Further, National argues that these internal security officers lack the training and expertise to identify unauthorized infringing products. National alleges that, unlike the defendant in *Fonovisa*, National made efforts to stop

the alleged infringing activity insofar as National indicated that it was willing to cooperate with Adobe and wanted to know what National could do to stop the illegal activity. (Kurtzman Decl., Ex. B.)

### a. *Size of National's Shows*

It appears that attendance at a typical National computer fair, such as the Pomona Computer Fair, may consist of up to 15,000 attendees in a given weekend. (Van Voorhis Decl., Ex. 1 at 29.) National's computer fairs are comprised of an average of 350 independent vendors per show, and up to 450 at a larger show such as the Pomona Computer Fair. (*Id.* at 26–27.) The Court finds that the presence of National's 20–person security force, whose primary purpose is to monitor access to the building and the perimeter, and two to five person internal security presence, does not meet the right and ability to control prong of *Fonovisa*.[8] The ability to control the crowds and the flow of traffic into the complex, or to respond to theft or vendor disputes within the complex, is not equivalent to the practical ability to police the content of up to 450 vendors' booths.

### b. *Scope of Infringement*

In *Fonovisa*, a pre-litigation raid by the Fresno County Sheriff's Department resulted in the seizure of more than 38,000 counterfeit recordings. In this case, Adobe alleges that the July 1999 raid resulted in the seizure of roughly 100 unauthorized items. The difference in scale between the scope of the infringing activity occurring in the two venues suggests that in *Fonovisa*, Cherry Auction's ability to

---

7. "[I]f they saw a product that was illegal, if they knew about it, they would do something about it. They would inform the show manager and security would go over and do something about it." (Van Voorhis Decl., Ex. 1 at 41.)

8. National's position is summed up in a letter to Adobe's counsel: "[W]e are an event that sells exhibit space to resellers. We don't have a working knowledge of every piece of product that every vendor brings to the show to sell. But we do not condone illegal activity, and if a vendor is caught selling stolen, illegal, etc., merchandise, [it] will be prevented from exhibiting in the show." (Kurtzman Decl., Ex. B.)

police the booths in order to eject those engaging in infringing activity was significantly greater than National's ability here to police the booths in search of a substantially smaller quantity of infringing product.

c. *Ability to Identify Infringing Product*

In this case, there is a question of fact regarding the ability of National's security guards to recognize the alleged infringing product. There can be no practical ability to control the infringing behavior if National does not know what constitutes an unauthorized Adobe product. National represented to the Court at oral argument that it was not possible to identify what software infringed Adobe's copyright without training and information that National lacked (and only Adobe possessed). In particular, some of the alleged infringing sales relate to vendors who sell authentic Adobe products without a license from Adobe. A layperson, or even a minimally trained security guard, would not be able to determine whether a vendor had the Adobe-required license. Thus, there is a genuine issue of fact as to whether National had the power to recognize what products infringed Adobe's copyright, even if its personnel did undertake the type of booth-by-booth, product-by-product oversight that Adobe advocates.

As the defendants in this action correctly point out, imposing strict vicarious liability on trade show operators for infringing sales can place the organizer in a Catch-22 situation. If the organizer retains the right to terminate vendors for any reason, it automatically meets the control requirement for vicarious liability. If the organizer does not retain this type of control, it risks not being able to act in the case of a dispute between two exhibitors, thereby potentially exposing itself to additional liability.

The Court finds that a triable issue of fact exists as to whether National had the

ability to root out the infringing conduct, given the size of the show, the number of security personnel, the alleged scope of the infringing activity, and the ability of National's staff to identify infringing Adobe products.

**4.  *Vicarious Liability Conclusion***

The Court is not persuaded that the proper identity of interest is present between National and the infringing vendors to justify the imposition of vicarious liability. The *Fonovisa* court directed lower courts to look for the defendant's "pervasive participation" in the activities of the direct infringers. *Fonovisa,* 76 F.3d at 263. The Court finds that National's pervasive participation in the infringing conduct at issue in this case remains a question of fact.

**D.  *Contributory Infringement of Adobe's Copyrights***

■ "[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Fonovisa,* 76 F.3d at 264 (citation omitted).

**1.  *Material Contribution***

In *Fonovisa,* the Ninth Circuit found contributory infringement where Cherry Auction, with knowledge of the infringing activities, provided support services, including space, utilities, parking and advertising for the vendors participating in its flea market. *Id.* Adobe alleges that the facts in this case are indistinguishable. In *Fonovisa,* the court stated that "it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet." *Id.* at 263. Similarly, Adobe argues, National provides the amenities such as parking and security

that make possible the distribution of unauthorized Adobe software. As with Cherry Auction in *Fonovisa,* here National provides the venue and all supporting services for the infringing vendors, such as parking, advertising, and customers. National also argues that it does not provide all of the supporting services for the site because parking, concessions and security are provided by the facilities. The Court finds that National provides, or arranges for the provision of, support services in an analogous manner to the actions of Cherry Auction in *Fonovisa.*

### 2. *Knowledge*

■ The Court finds that there is a disputed issue of fact as to whether National had sufficient knowledge of the infringing activity to justify the imposition of liability. Adobe claims that National knew that infringing activity was occurring because Adobe sent National a letter on April 30, 1996 that informed National that infringing activities were taking place at its computer fairs. (Van Voorhis Decl., Ex. 3.) In addition, Adobe asserts it warned National again in March 1999 of the problem (the warning consisted of the distribution of flyers at the fair), only to be ejected from the premises.

National denies that it had knowledge of the infringing activity, or that there is any evidence that National had knowledge of the alleged infringement before the raid of July 17, 1999. National claims that the 1996 Adobe letter referred only to "possible sales of stolen Adobe software" and that there was no follow-up to the letter. *Id.* National claims that the March 1999 incident cannot be construed as putting National on notice of infringing activities.

In *Fonovisa,* there was no dispute for purposes of the appeal that Cherry Auction was aware that vendors in its swap meet were selling counterfeit recordings in violation of Fonovisa's trademarks. Indeed,

the record suggests that the entire purpose of the swap meet was to provide a forum for dealing in counterfeit recordings. In 1991, the Sheriff's Department raided the Cherry Auction swap meet and seized more than 38,000 counterfeit recordings. In that case, one year after the raid, the Sheriff sent a letter notifying Cherry Auction of ongoing sales of infringing materials. In 1993, Fonovisa itself sent an investigator to the Cherry Auction site and observed sales of counterfeit recordings. The court therefore refused to credit Cherry Auction's claims of ignorance, and found that Cherry Auction had in fact actively interfered with law enforcement efforts to identify infringing vendors by protecting infringer's identities. *Fonovisa,* 76 F.3d at 264.

In this case, the Court finds that triable issues of fact exist regarding National's knowledge of the infringing activities for purposes of imposing liability for contributory copyright infringement. As stated above, the scale of the infringing activity in *Fonovisa* made it clearly implausible that the defendant was not aware of the activity. In this case, Adobe alleges a dramatically smaller number of infringing items seized. National's knowledge of infringing activities remains a question of fact for trial.

### E. *Kushner as Alter–Ego of National*

Because the Court finds that genuine issues of material fact exist as to both Adobe's vicarious liability and contributory copyright infringement claims such as to preclude summary judgment, the Court declines at this time to address Adobe's claims against Robert Kushner as an individual.

### III. Conclusion

■ For the reasons set forth above, the Court denies the plaintiff's motion for

partial summary judgment. The plaintiff must succeed on the merits of its claims to be entitled to a permanent injunction. *See Coleman v. Wilson,* 912 F.Supp. 1282, 1311 (E.D.Cal.1995). Here, the plaintiff has not succeeded on the merits of its claims for partial summary judgment, and therefore Adobe is not entitled to a permanent injunction.

IT IS SO ORDERED.